(March 11, 1915.)

STATE, Respondent, v. C. J. CLARK, Appellant.

[146 Pac. 1107.]

CRIMINAL LAW—JURORS—CHALLENGE—IMPLIED BIAS—EVIDENCE — MO
    TION TO STRIKE OUT — DEFENDANT'S WITNESS — ARREST OF — IN
    PRESENCE OF JURY — CONDUCT OF PROSECUTING ATTORNEY — PREJU-
    DICE — NOT CURED BY INSTRUCTION — REJECTION OF OFFERED EVI
    DENCE—CONTINUANCE—AFFIDAVIT FOR—ADDITIONAL INSTRUCTIONS—
    ERROR — DATE OF CRIME — ELECTION BY STATE — MOTION FOR NEW
    TRIAL — COUNTY ATTORNEY — COMPEL DEFENDANT TO LEAVE THE
    STATE—CONTRADICTORY TESTIMONY—INSTRUCTIONS—ACCOMPLICE.

1. The court did not err in denying challenges to certain jurors on the ground of implied or actual bias.

2. Where a motion is made to strike out the entire answer of a witness where a part of such answer is responsive to the question and a part is not, it is not error for the court to deny such motion.

3. Where a witness for the defendant testifies that he was in the room of the prosecutrix on the evening or night the alleged crime was committed, and the prosecuting attorney states in open court and before the jury that the witness, according to his own testimony, had committed an offense under the laws of the state, and demands that he be remanded to the custody of the sheriff to be prosecuted for such offense, and the court thereupon orders the arrest of the witness, and he is arrested in the presence of the jury and taken from the courtroom and placed in the jail, such proceeding is prejudicial error and an invasion of the rights of the defendant, and an intimation of the opinion upon the part of the court that the witness had committed either perjury or some other felony. Such action was prejudicial to the rights of the defendant.

Argument for Appellant.

4. An instruction given by the court to the effect that the jury must not be influenced in any way by the action of the court in ordering the arrest of the witness in the presence of the jury and must not be influenced by the remarks of the court or counsel touching the arrest of said witness, did not, and could not, cure the error of the conduct of counsel or the action of the court in said matter.

5. *Held,* that the action of the assistant prosecuting attorney and the arrest of the witness in the presence of the jury was reversible error.

6. It was error for the court to reject any of the testimony given by the prosecutrix on the preliminary examination which would tend to impeach or contradict the testimony she gave on the trial of the case.

7. *Held,* that the court erred in refusing to admit certain affidavits made for a continuance, where the state, in order to avoid a continuance, admitted that if the witnesses named in the affidavits were present, they would testify as set forth in the affidavits.

8. *Held,* that the court erred in giving certain instructions.

9. *Held,* that the court erred in not granting defendant's motion for a new trial.

10. Under the provisions of sec. 7871, Rev. Codes, a conviction cannot be had upon the testimony of an accomplice unless he is corroborated by other evidence.

11. Where the testimony of the prosecutrix is contradictory or her reputation for truthfulness and veracity is impeached, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated by other witnesses, the testimony of the prosecutrix without corroboration will not warrant a conviction.

APPEAL from the District Court of the Fifth Judicial District, in and for Power County. Hon. Alfred Budge, Judge.

The defendant was charged with and convicted of the crime of incest and sentenced to a term of from five to ten years in the penitentiary. Judgment reversed and a new trial granted.

McDougall & Jones and T. S. Becker, for Appellant.

The record discloses that the jurors Meadows and Beckstead had heard the facts in this case and had formed an opinion

which would require evidence to remove at the time of the examination. (*Burke v. McDonald,* 3 Ida. 296, 29 Pac. 98; *State v. Caldwell,* 21 Ida. 663, 123 Pac. 299; 24 Cyc. 302.)

The admission of a statement of prosecuting witness that when she was a child ten years ago another and distinct crime had been committed by the defendant was clearly error. (62 L. R. A. 338, note; 12 Cyc. 405; *People v. Bowen,* 49 Cal. 654; *State v. Anthony,* 6 Ida. 383, 55 Pac. 884; *State v. Williams,* 36 Utah, 273, 103 Pac. 250; *State v. Marselle,* 43 Wash. 273, 86 Pac. 586.)

The court erred in directing the sheriff to take into his custody a witness for the defendant off the witness-stand and in the presence of the jury. (*Golden v. State,* 75 Miss. 130, 21 So. 971; *Commonwealth v. Brady,* 71 Mass. (5 Gray) 58; *Reed v. State,* 5 Okl. Cr. 365, 114 Pac. 1114.)

"It is the duty of the trial court to refrain from allowing their acts and words to indicate to the jury their opinion of the credibility of any witness who testified in a case on trial before them, or of the merits of any such case." (*State v. Hughes,* 33 Kan. 23, 5 Pac. 381; *People v. Abbott,* 4 Cal. Unrep. 276, 34 Pac. 503; *Hicks v. United States,* 2 Okl. Cr. 626, 103 Pac. 873; *State v. Taylor,* 7 Ida. 134, 61 Pac. 288; *State v. Fowler,* 13 Ida. 317, 89 Pac. 757.)

The court erred in rejecting the offer of the defendant to read to the jury the answers made by the witness Abi Clark Luper before the committing magistrate at the preliminary examination, offered for the purpose of impeaching her evidence given at the trial. (*State v. Trego,* 25 Ida. 625, 138 Pac. 1124; *State v. Corcoran,* 7 Ida. 220, 61 Pac. 1034; *State v. Fowler,* 13 Ida. 317, 89 Pac. 757.)

Where the testimony of the prosecutrix is contradictory, or her reputation for truthfulness and veracity is impeached and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction. (*State v. Trego,* 21 Ida. 625, 138 Pac. 1124; *State v. Tevis,* 234 Mo. 276, 136 S. W. 339.)

If prosecutrix submits to the intercourse, though unwillingly, she is an accomplice. (*Mercer v. State*, 17 Tex. App. 465; *Coburn v. State*, 36 Tex. App. 258, 36 S. W. 442; *Clifton v. State*, 46 Tex. Cr. 18, 108 Am. St. 983, 79 S. W. 824; *Tate v. State* (Tex. Cr.), 77 S. W. 793; *Gillespie v. State*, 49 Tex. Cr. 531, 93 S. W. 556; *Skidmore v. State*, 57 Tex. App. 497, 123 S. W. 1129.)

J. H. Peterson, Atty. Genl., T. C. Coffin and E. G. Davis, Assts., O. R. Baum and W. G. Bissell, for Respondent.

If the challenge is for actual bias, it must be alleged that the juror was biased against the party challenging. (*State v. Gordon*, 5 Ida. 297, 48 Pac. 1061; *People v. Reynolds*, 16 Cal. 128.)

The examination of the jurors Meadows and Beckstead failed to disclose implied bias under subdivision 8 of sec. 7834, upon which the appellant relies, namely, that these jurors had formed or expressed an unqualified opinion or belief. (*People v. Reynolds*, 16 Cal. 128; *State v. Millain*, 3 Nev. 409–429; *State v. Davis*, 14 Nev. 439–450, 33 Am. Rep. 563; *People v. O'Loughlin*, 3 Utah, 133, 1 Pac. 653.)

The decision of the trial judge as to whether a juror is biased has the effect of a verdict of a jury upon the facts, and will seldom, if ever, be disturbed. (*People v. O'Loughlin, supra.*)

According to some authorities the court may, in the exercise of its discretion, commit to jail, in the presence of the jury, a witness who has in its opinion perjured himself before the jury, or at the preliminary examination, without committing error. (12 Cyc. 542; *Commonwealth v. Salawich*, 28 Penn. Super. Ct. 330; *State v. Strado*, 38 La. Ann. 562; *Linsday v. People*, 67 Barb. (N. Y.) 548, 63 N. Y. 143; *People v. Hayes*, 70 Hun, 111, 24 N. Y. Supp. 194, 140 N. Y. 484, 37 Am. St. 572, 35 N. E. 951, 23 L. R. A. 830.)

Where a witness upon the stand tells a part of the incriminating evidence against himself, voluntarily and without claiming his privilege, he is obliged to make a complete dis-

closure thereof. (*People v. Freshour,* 55 Cal. 375; *Clark v. Reese,* 35 Cal. 89.)

SULLIVAN, C. J.—The defendant was convicted of the crime of incest, alleged to have been committed upon his daughter, a married woman about twenty-two years of age, on the 14th of January, 1914, in Power county, and was given an indeterminate sentence in the state penitentiary for a term of not less than five years and not to exceed ten years.

A motion for a new trial was denied and the appeal is from the judgment and the order denying the new trial.

The errors specified to have been committed by the court were in regard to challenges of certain jurors; refusing to strike out certain testimony; directing the sheriff in the presence of the jury to arrest one of the defendant's witnesses on account of testimony he gave on the trial; rejecting certain evidence offered by the defendant; permitting the foreman of the jury, after having been out seventeen hours, to state the matters which in his opinion were preventing the jury from agreeing and in instructing the jury upon such points; giving certain instructions; overruling defendant's motion for a new trial; and in instructing the jury that they might convict upon the uncorroborated testimony of the prosecutrix.

The record shows that the defendant is a man 51 years of age and has a wife and family of ten children, the two oldest being the prosecutrix (about 22 years of age) and a Mrs. Dowell, a married woman about 20 years of age.

The record shows that the people in and about Rockland and vicinity where the defendant resided became very much excited over this matter and very much prejudiced against the defendant, and the county attorney took a very active part in working on the case prior to the time the defendant was arrested, and also assisted in persuading the defendant to leave the state and go to the state of Oregon, with the understanding that he would not be prosecuted provided he stayed away, the claim being made that if defendant would do this his family would not be disgraced. The husband of the

prosecutrix and also the husband of her sister, as well as a banker of Rockland, took a very active part in this matter. It appears that the defendant had two or three farms in Power county, worth considerable money, and that he had threatened to disinherit the prosecutrix if she married the man she did marry, and that he had paid a physician for performing an operation on Luper, the husband of the prosecutrix. Regardless of the facts stated, the prosecuting witness testified that she was afraid defendant, her father, would kill her husband, and the record shows that she was somewhat exercised on this subject and desired to have her father leave the state; that after the county attorney and the prosecutrix, her said sister, Mrs. Dowell, her husband and brother-in-law, a prominent business man, and the sheriff had consulted over the matter, it was insisted that the defendant leave the state, and the sheriff and the county attorney accompanied him from Rockland, or his home near there, to American Falls, for the purpose of seeing that he took the train and left the state, as urged and suggested by them. The defendant went to Vale, Oregon, where he was arrested about two weeks later, and was prosecuted and convicted of said crime.

The feeling ran high in the county against the defendant, and in the selection of a jury, Jurors Meadows and Beckstead stated that they had heard the facts, or some of them, in the case and had formed an opinion, and had an opinion which it would require evidence to remove. They were challenged on the ground of implied and actual bias. Beckstead also was challenged on the ground that the prosecuting attorney was his personal attorney.

It is contended by counsel for the state that said challenges were properly overruled, for the reason that under the provisions of sec. 7836, Rev. Codes, in a challenge for implied bias one or more of the legal causes provided as the ground of a challenge for implied bias by the provisions of sec. 7834 was not stated as the ground of challenge. Sec. 7834, Rev. Codes, states nine grounds of challenge for implied

bias, and neither of said grounds was stated in said challenge, as required by said sec. 7836.

Under all of the facts as they appear in the record, we do not think the court erred in overruling said challenges, but would suggest that in this class of cases, where prejudice is usually so great against a defendant charged with such a crime, a court ought to be very careful in the selection of a jury to reject all persons who are biased and prejudiced in the matter.

It is next contended that the court erred in overruling defendant's motion to strike out the following answer of Geneva Dowell, daughter of the defendant and sister of the prosecutrix: "Q. The particular thing that you were afraid of was that your husband would find it out? A. Yes; because my father was too intimate with me." It is contended that said answer was not responsive and was highly prejudicial. It is clear that "yes" would have fully answered the question and was responsive, and the witness throwing in the remark, "because my father was too intimate with me," was improper and not responsive to the question; but since counsel moved to strike out the whole answer when a part of it was proper, the court did not err in refusing to strike out the entire answer, whereas it would have been error for the court to have denied a motion to strike out that part of the answer which was not responsive to the question. Since the motion was to strike out all of the answer, the court did not err in denying that motion.

The fifth specification of error involves the action of the court in directing the sheriff, in the presence of the jury, on motion of the prosecution, to take into custody witness Haggard, who testified on behalf of the defendant that he was at the residence of the defendant on the evening and night of the 14th of January, the date said crime was alleged to have been committed, and that he talked with the prosecutrix, and in that conversation he told her that he was coming to her room that night, and she said, "Well, Jim, you know where my room is." He testified that he went to her room sometime between 10 and 11 o'clock and remained there about thirty

minutes; that he left there about 11 o'clock, or fifteen minutes after, and that the defendant was not in her room at that time. On cross-examination by Mr. Bissell, who was assisting the prosecuting attorney, the following proceedings were had: "Q. You went in there [meaning into the prosecutrix's bedroom]? A. Yes, sir. Q. You stayed about thirty minutes? A. Yes, sir. Q. What did you do while there? A. We talked. Q. Just talked—just went in there and talked? A. Yes. Q. You stayed and visited about thirty minutes? A. Yes, sir. Q. All you done? A. I refuse to answer what I did. Mr. Bissell: Now, your Honor, we insist that the witness tell. The Court: If he wants to claim that privilege, of course I don't know. Mr. Bissell: We have a right to show it. The Court: Why do you object to answering? A. It is incriminating myself, isn't it? The Court: I don't know whether it is or not. You should know that. You may proceed, Mr. Bissell. Mr. Bissell: I will ask that this witness, who is now on the stand, according to his own testimony having committed an offense under the laws of the state of Idaho, be remanded to the custody of the sheriff. Mr. Jones: If your Honor please, we say that is vicious misconduct upon the part of the attorney for the state in the presence of this jury. The Court: Are you through? Mr. Bissell: I now ask that this man be remanded to the custody of the sheriff, for the reason that in accordance with his own testimony he has shown himself guilty of a criminal offense. Mr. Jones: We resist that demand and desire the record to show that it is made for the purpose of creating a prejudice in the minds of this jury, and it is not in line with any rules of evidence that counsel can cite. We except further to the statement of counsel with reference to this witness. The Court: Are you through with the examination? Mr. Bissell: We are. The Court: Are you, Mr. Jones?"

Thereupon Mr. Jones proceeded to re-examine the witness and after he had concluded the court said: "Mr. Sheriff, you will take this witness in custody and retain him until such time as this case might be investigated. I will instruct the jury with reference to this matter, gentlemen, before

this case is finally submitted to them. Mr. Jones: Allow an exception to the order of the court. The Court: You may have your exception. Mr. McDougall: Let the record show that the sheriff took the witness from the stand, in the presence of the jury. The Court: No, I don't know that the record need show that, General McDougall. Let the record show that I simply remanded him to the custody of the sheriff, and excused him from further testifying.. The physical fact is apparent, however, that he was taken out of the court-room.''

As we view it, the conduct of the assistant prosecuting attorney in this matter was reprehensible, and he ought to have been reprimanded by the court; but no doubt the matter was sprung so quickly on the trial judge that he either concluded that the witness had committed perjury or that he had committed a crime by staying in the room with the prosecuting witness for half an hour and then refusing to testify what he did there for the reason that it might incriminate him. The jury heard and observed the entire proceedings. They heard the assistant prosecuting attorney say, ''I now ask that this man be remanded to the custody of the sheriff for the reason that in accordance with his own testimony he has shown himself guilty of a criminal offense.'' Thereupon the court remanded the witness to the sheriff in the presence of the jury, and the witness was arrested and taken from the courtroom.

It is clear to us that the remarks of the prosecuting attorney and the action of the court in ordering the witness into the custody of the sheriff was most prejudicial to the defendant. The action of the court informed the jury that it was satisfied that the witness had committed either perjury or adultery, which very much discredited him in the minds of the jury as well as prejudiced the defendant's case. It is a well-recognized fact that jurors as a rule are quick to discern the opinion of the trial court as to the guilt or innocence of a defendant, or his opinion as to the truthfulness of a witness, and if a juror concludes from the act or suggestion of the court that it disbelieves a witness, it is sure to

have a prejudicial effect against the litigant calling the witness, and especially is this true where public feeling and prejudice run rampant against a defendant charged with a horrible crime.

It was said in *Reed v. State,* 5 Okl. Cr. 365, 114 Pac. 1114, in a case very much like the one at bar, that "The most liberal advocate of the doctrine of harmless error could not insist that a conviction secured un'der such circumstances should be allowed to stand. . . . . Trial courts should carefully refrain from allowing their actions or words to indicate to the jury any opinion whatever as to the merits of any case upon trial before them or their idea of the credibility of any witness who testifies before a verdict is rendered, and especially so in the trial of criminal cases."

In *State v. Primmer,* 69 Wash. 400, 125 Pac. 158, which was an incest case, it was held that for the judge, in the presence of a jury, after the witness has testified, to order her into the custody of the sheriff and direct the proper officer to file a charge of perjury against her, is a comment on the facts and reversible error. (See, also, *Golden v. State,* 75 Miss. 130, 21 So. 971; *Commonwealth v. Brady,* 78 Mass. 58; *State v. Hughes,* 33 Kan. 23, 5 Pac. 381.)

It may have been that if the prosecuting attorney and the court had not discredited the witness Haggard, the jury might have found the defendant not guilty, for if Haggard's testimony in regard to being present in the room of the prosecutrix for a half hour on the evening of the 14th of January, 1914, had been believed by the jury, they no doubt would have found the defendant not guilty of the crime charged, as Haggard testified that he was in the room with the prosecutrix at the very time that she claimed her father was in there with her. It is in this view of the matter that appears the grave injustice done to the defendant by the action of the prosecuting attorney and the court in ordering the witness arrested as was done. As to misconduct of prosecuting attorney, see *State v. Jackson* (Wash.), 145 Pac. 470.

But it is contended by counsel for the state that the court rendered its action harmless in having said witness arrested, by giving the following instruction:

"You are not to be influenced in any way by the action of the court in detaining the witness, James Haggard, pending investigation, or by the remarks of the court or counsel touching this matter, but you should consider the evidence only in this case and apply the law as given you in these instructions in determining the guilt or innocence of the defendant."

Regardless of this instruction, the jury was out seventeen hours deliberating before it brought in a verdict of guilty. That instruction could not render the previous action of the court in regard to the arrest of said witness harmless. The whole proceeding in regard to that matter no doubt influenced the minds of the jury against the defendant and prejudiced them against him. Such an error as this cannot be cured by a simple instruction to the jury, for we all know, as men and lawyers, what effect such proceedings would have upon the mind of the average juryman. That instruction would not take from the minds of the jury the fact that said witness had been discredited by the court and that in the opinion of the court he was guilty of perjury or some other felony. The prejudice created by the demand made by counsel for the state and by the court in granting such demand, in the presence of the jury, could not be cured by any instruction. In any case, and especially in such cases as the one at bar, the trial court should refrain from allowing his acts or words to indicate to the jury his opinion of the credibility of any witness who testifies for the defendant or the state.

In *State v. Taylor*, 7 Ida. 134, 61 Pac. 288, the court said:

"In the trial of a criminal case, and more especially one in which the life of the defendant is involved, the trial court cannot be too careful in refraining from any act or expression which can possibly tend to prejudice the case of the defendant with the jury."

The action of the deputy prosecuting attorney in this matter and the arrest of said witness in the presence of the jury was clearly reversible error.

Counsel for the defendant offered to read to the jury certain answers made by the prosecutrix before the committing magistrate at the preliminary examination, for the purpose of impeaching certain evidence given by her on the trial, and the court rejected such offer. This action of the court is assigned as error. It was error for the court to reject any of the testimony given by the prosecutrix on the preliminary examination which would tend to impeach or contradict the testimony she gave on the trial of the case, since it was the clear right of the defendant to show to the jury that the prosecutrix had testified to one state of facts on the preliminary examination and to another state of facts on the trial, if he could do so.

A motion was made for a continuance of the trial of this case, supported by affidavits. On the hearing of said motion it was admitted by the state that the witnesses referred to in the affidavits, if present, would testify as set out in the affidavits, subject, however, to the competency of such testimony. On such admissions the motion was overruled. On the trial said affidavits were offered in evidence and rejected by the court on the objection of the assistant prosecuting attorney. Said affidavits go to show the physical and mental condition of the prosecuting witness for several years prior to her charging the defendant with this crime, and that she had made similar charges against two persons in the state of Washington, when such charges were absolutely false. The court erred in rejecting those affidavits, as they tended to show the mental and physical condition of the prosecutrix and that she had charged others with similar crimes.

The eighth, ninth and tenth assignments of error refer to the action of the jury in returning to the courtroom after having been out seventeen hours, and asking for further instructions from the court. After the jury had returned the court said: "Gentlemen of the jury, the bailiff informs me that you desire some additional instructions. Mr. Creasey (Foreman of the jury) : Yes, sir. The Court: What seems to be the point? Mr. Creasey: In one case, there are some that want to know if this evidence must be on just the 14th,

the night of the 14th, and morning of the 15th only; consider that only, and I think with probably two or three there is the sticking point. The Court: All right, Mr. Foreman, Gentlemen of the jury, the court will give the following instructions with reference to the matter inquired about:

"The court instructs you that the state elected to secure a conviction of the defendant for the crime of incest alleged to have been committed on the night of January 14th or morning of January 15, 1914, and more definitely fixed and explained as the time shortly subsequent to the operation performed upon the husband of the prosecutrix, as testified to by the witnesses. If you are satisfied, beyond a reasonable doubt, that the defendant had sexual intercourse with the prosecutrix at said time or date, in the manner and form as alleged in the information, the defendant would be guilty of incest, and it would be your duty to so find. . . . . It would be immaterial whether said act was committed on the night of the 14th or morning of the 15th of January, 1914. . . . . "

The state elected to rely for conviction upon the act of incest alleged to have been committed immediately after the operation on the husband of the prosecutrix, and fixed the time as the evening of the 14th or morning of the 15th of January, 1914. It would appear from the question asked by the foreman of the jury, above quoted, that there was a query in the minds of some of the jurymen, at least, as to whether if the defendant were convicted it must be upon the testimony showing that the act was committed on the night of the 14th or morning of the 15th of January, and it is contended by counsel that it was highly prejudicial to the defendant for the court to give said instruction and not limit the jury to the time elected by the state in said case. The testimony of the prosecutrix as to the time the act occurred was contradictory and conflicting. At one time she placed it on the night of the 15th and again testified positively that it was on the night of the 14th—the 14th being the day when the operation was performed on her husband. Thereafter she testified that it was on the night of the 15th and she again

testified that when she said at the. preliminary hearing that
her father made advances toward her on the night of the 14th
it was false.    Again she testified it was either on the 14th or
15th, but could not remember which.    From this conflicting
testimony it can readily be seen that the jury might well in-
quire whether they were confined to the particular time which
the state had elected, which was the night of the 14th, since
the witness Haggard had testified that he was with the prose-
cutrix for a half hour or more between 10 and 11 o'clock on
the night of the 14th, and if his testimony be true, the de-
fendant was not there from 8:30 P. M. until midnight on the
night of the 14th, and there was no testimony whatever that
the act occurred on the morning of the 15th.    The prosecu-
trix, however, testified that the defendant came to her room
on the night of January 14th at about 8 o'clock and remained
until midnight.

The prior acts of defendant testified to would only be com-
petent, if competent at all, for the purpose of showing famil-
iarity between the parties or for the purpose of corroborat-
ing the offense charged, provided it should be held that the
prosecutrix was not an accomplice.    In case she were an
accomplice, she could not corroborate her own testimony by
testifying that the defendant had been intimate with her
prior to the date of the crime charged in the information or
prior to the time of telling others that he had done so.    That
being true, the jury should have been limited to find whether
the act was committed on the date elected by the state, and
the court should have limited the jury to the time so elected,
since the defendant was not prosecuted for any other act
than the one charged to have occurred on the date so elected
by the state.

Counsel next specifies the action of the court in overruling
defendant's motion for a new trial as error.    The evidence
shows this to be one of the most remarkable cases of its kind
that has ever come under our observation.    The children of the
defendant, one twenty years of age, married and the mother
of two children, the other twenty-two, also married, testified
against their father, the defendant, charging him with one

of the most horrible crimes that a father could commit. The older daughter's main pretense was that she had to make this complaint against her father in order to save her husband, whom she claimed her father had threatened to kill, and the other daughter claimed that she was led to believe her husband would leave her and her children and thus disgrace them unless she charged her father with a similar crime and supported the testimony of her sister in attempting to send her father to the penitentiary, and also perhaps out of fear that the father might disinherit them. A neighbor or neighbors took a hand in the matter, as well as the sheriff and county attorney, and the evidence shows that they sought to intimidate the defendant and drive him out of the state. The record shows that the county attorney was most active in this matter, claiming all the time that he wanted to protect the family from disgrace; but according to the record, it appears that he suggested several times to the defendant that he ought to do the right thing by the prosecutrix and her sister in the distribution of his estate or property. The pretended desire of the county attorney to save the family from disgrace by driving the father out of the state was evidently a very shallow pretense. Apparently the county attorney was more interested in the distribution of the defendant's property than in the prosecution of the defendant for the crime charged. He was so insistent in the matter that he would not permit the defendant or his wife, the mother of the prosecutrix and her twenty-year old sister, to talk with either of them unless he was present, and he and the sheriff accompanied the defendant to the railroad station in their evident purpose to drive the defendant out of the state. It seems wholly improbable that a neighbor or friend, the sheriff and the county attorney, could imagine that this matter could be hushed up and the disgrace of the prosecutrix and her sister avoided by driving the defendant out of the state, when the husbands of both knew all about the charges these sisters had made against their father. They also took possession of a boy of some eighteen years of age and would not let the

mother or father have possession of him until they were com-
pelled to do so by writ of *habeas corpus*.

All of the facts in this case and surrounding this trans-
action, as appear from the record, show that there was some
motive back of it all, aside from protecting the family from
disgrace, as was urged by the county attorney and the pre-
tended friend.   The evidence clearly shows a conspiracy to
get rid of the defendant by driving him out of the state.

In a conversation at Fisher's bank at Rockland on the day
of the evening that the defendant left the state for Oregon,
the defendant, Baum, Fisher and Mrs. Clark being present,
Mrs. Clark testified as follows: "Mr. Clark begged for them
not to drive him off that way, that he had business at home,
that he couldn't leave, and that he had horses that the chil-
dren couldn't manage, and Mr. Fisher said he would have to
hire someone to take care of the horses, and Mr. Fisher helped
Mr. Baum decide on the way that Mr. Clark should leave
home."   This evidence is not contradicted by either Fisher
or Baum.   The witness further testified that when it was
concluded that the defendant must go to American Falls that
evening and take the train, "I said that I was going with Mr.
Clark to the Falls.   Mr. Baum said that Mr. Jefferies [the
sheriff] had a single rig and there was no room for me.   I
told him we had teams and I was going to the Falls with him.
He said: 'All right,' and for us to go on home and be ready
at 7:30, and Mr. Baum came by.   Q. Did they permit you to
talk to your daughter Geneva that night?   A. No, sir.   Mr.
Baum come right around with her and stayed right by her."

The defendant himself testified in regard to his conversa-
tion with the prosecuting attorney Baum as follows: "He
told me that I would have to leave the state, but he says,
'You have got to own up to this before you go,' and I says:
'I will not tell any kind of a lie like that on myself and
daughters.'   He says: 'You are a liar, and this is so and
know it is so,' and went on that way, and finally he said:
'Supposing both of the girls say that it is so, then what would
you say?' and I said: 'I would say it is a lie just the same.'
He says: 'You wait here for a little while and I'll go back

to Fisher's,' and he went and the sheriff was in there, and he never said nothing, and he come back, and he says, 'Mrs. Dowell says it is so too; now what do you say about it?' and I says, 'Just the same as I did, that there is not a word of truth in it,' and he says: 'I'll tell you, Mr. Clark, what I'll do. I am willing to let you go providing you will leave the state and never return any more,' and I says: 'That's a pretty hard sentence. If you've got a warrant for me, why don't you take me under arrest instead of trying to get me out of the state,' and he says, 'I am doing this to save the name of them girls, and that is why I am letting you go, Mr. Clark,' and he says, 'You must not forget these girls in their part of the estate,' and he come over that lots of times to me. He was talking that I should give so much to each one of these girls.''

Neither Baum, Fisher nor the sheriff denied any of the testimony of the defendant and his wife in this case.

It appears that the defendant was taken by the county attorney and sheriff to American Falls that evening and started on his way out of the state. The daughter, Mrs. Dowell, shortly after that wrote letters to her father, and also a letter to H. C. Eastham, the attorney of the defendant in Oregon, the latter dated March 3, 1913, which was clearly intended for March 3, 1914. The letter to Eastham speaks for itself and is as follows:

"Rockland, Idaho, March 3, 1913.

"Mr. H. C. Eastham:
"Dear Sir:—

"I received your letter this morning and will give you an account of all that happened.

"Papa and Mamma stayed at my home Tuesday night and I come home with them Wednesday with the intention of staying until I had my teeth fixed. Thursday morning we went to town and Mamma and I called to see the minister's wife. While mamma was in Mrs. Shaw's bedroom the Doctor called. He asked me if I'd seen Abi yet, and I told him no. He said she was up to Mrs. Fisher's and was sick. He told me to go and see Abi, and whispered and said: 'Go

alone.' Of course, I knew papa didn't like Mr. Luper, and I thought Abi wanted to tell me her trouble, so I went. When I went in Abi asked me to sit down, but I told her I had to hurry because I had left my baby with mamma. She asked me to go in the bedroom with her so I went. She told me that papa was going to kill John, and I laughed at her. She talked for a few minutes, and then asked me if I didn't hear papa say he was tempted to kill John. Of course, I said yes because it was true. She told me to go into the other room and we would talk it over with John. I told her I was not going to say a word to John. I turned around to go out and there stood John in the door. He had heard every word I said. He told me he heard what I said and said for to tell Mr. Baum. I told him I had to go back to Shaw's to Mildred and he stood with his back to the door. Abi then asked me to confirm what she said about herself, papa and I being too intimate. That I knew to be false and told her so. She denied it and said I knew it to be true. We disputed over it until I was so nervous I could hardly stand on my feet. I told her and John if I was scared to death like they were and had no little ones I would walk off of my place and leave the country before I would stir up a row like that. John said if papa would give him between three and four thousand dollars for his place he would leave quietly. Of course, no one would give that price for a place like he has. Anyway it looked like only a coward would buy a place on conditions like that. Then they told me they had enough evidence anyway— But if I would say what they told me too there would be no publicity about it whatever and if I didn't we would all be disgraced. I told them I'd die *any* kind of a death before I'd swear a lie on my papa. By that time I was nearly dead I was so nervous. Still I refused to see or speak to Mr. Baum. My sister got something in a glass of warm water and told me to drink it and I'd feel better. I was innocent enough, or rather *green* enough to drink it. I fainted and when I came to my senses John & Baum were putting me into a large arm chair. I felt numb all over.

Just like I imagine one feels after being drugged. I could hear Baum talking to me and could hear myself answer—it all seemed a dream—a nightmare. Baum got up and said he would go to town and talk to papa. I remember Abi and John leading me to a lounge and telling me to lay down and sleep. I objected. Said Mildred would be crying. Abi and Mr. Baum said for John to go and get baby and for me not to go outside at all and if mama should come to see Abi for me to be just as natural as I could and not tell anything that had happened. I was still so weak I didn't care so I just lay still. Mama said papa was ready to go. I told her I'd stay with Abi until eve and John would take me up. She only stayed a few minutes. I stayed from one thirty until 4:30 and then Baum came back and said papa said positively it was false. Of course I knew it was but I was still feeling so stupid that I did not care. Baum went back and stayed until 5:30, then we saw papa's team leave town. I cried and told them I was going to cut across and go home with papa and mama. John said I should not. Baum and Mr. Fisher came then and said papa still said it was not true, but would leave town, also leave the state. They all went into the dining room and left me in the parlor. I ask why and Abi said they were afraid to tell me; afraid I'd faint again. I heard Fisher say that Abi would get her full share of papa's estate. They said everything would be sold and we kids provided for. Mr. Fisher ask me if my mother knew that we girls and papa was too intimate with us. I said *no.* Abi said *Yes.* I told him my mother was a lady and only a coward would speak doubtfully of her. Baum wanted me to talk to him again and I would not. I was in the kitchen and Abi ask me why I wouldn't. I told her I hated him. They said swallow my dislike and talk anyway. Baum came to the door and said if my Mama stayed home that night I should *not.* Said Mr. Jefferies would go up with John and get my other baby. Said Mama had too much influence over me. They tried to make me think my father would kill me. I told them I knew better. Mr. Fisher told me to tell my husband that papa was mean to

me. I told him I would die first. Then they ask me if I loved papa. I told them certainly. John and Abi went to the restaurant with Mrs. Fisher and Mr. Fisher. They left me with Mrs. Fisher's mother. At 7:15 we left town and started to papa's home. We met papa and mama leaving & Baum got out of his buggy and helped me out of John's buggy. He stood by me and I couldn't get to talk to papa. I hope I have made it all clear to you. Wasn't put on oath at all.                    (Signed)   Mrs. DOWELL.''

The author of said letter testified that her mother procured her to write that letter, although her mother was in Oregon at the time it was written. However, many of the statements in said letter showing the truthfulness of it were admitted by its author when testifying for the state, and many of the statements are shown to be absolutely true by other testimony. She was a married woman, of mature years, the mother of two children, and is it not almost improbable that she should sleep in the same room with her sister, the prosecutrix, for some time, and the alleged conduct of her father going on once or twice a week and she not know anything about it? Her testimony shows that all she knew in regard to the matter was what her sister admitted some three years before the trial of the case that her father had committed such acts with her. And is it not improbable that a mother of eleven children should sleep for years in the house of three rooms only and not know something of the alleged conduct of the father with the daughter provided such conduct occurred? The alleged acts were testified to by the prosecutrix as having occurred in the house in bed. The prosecutrix testified that she did love her mother before her marriage and still she never intimated to her that her father was having illicit relations with her. Just before she was married she stated to her mother that she was going to her husband a pure woman aside from some conduct with an uncle alleged to have occurred in the state of Washington. It seems so improbable that a mother would not know of the alleged conduct of her husband, occurring year after year, and if she did know of it that she would

quietly submit to having such conduct going on in the very room in which she slept with her children and husband. The evidence clearly shows that the prosecutrix was very angry with her father because he would not permit her to marry the man Malcolm, and she stated when testifying, in effect, that she made these charges against her father because she was afraid he would kill her husband, when all of the evidence goes to show that at the time of their marriage, and for several weeks thereafter, every week the prosecutrix and her husband visited the father at the family home, stayed there for several days at a time; that her father employed a doctor to perform an operation on her husband, assisted with the operation and paid the doctor twenty-five dollars in gold for performing such operation.

These physical facts and many others contained in the record go to show that this story of the fear of the witness that the father would kill her husband was a mere subterfuge and brought forth to conceal some other ulterior purpose,— the purpose, as the record shows, to get what is claimed to be her part of her father's property.

The morning after the father was driven out of the state by the prosecuting attorney and the sheriff,. the husband of the prosecutrix appeared at the ranch of the defendant and took therefrom two pedigreed pigs, thus showing that they could not wait until the defendant had gotten out of the state before taking possession of a part of his property.

The wife of the defendant testified that her daughter, Mrs. Dowell, stated to her several different times that the prosecutrix had told her that they had the father "going" now and that they would get their portion of the estate. This was told the mother after the father had gone to Oregon. The wife of the defendant testified as follows: "Q. When and where? A. Oh, she told me that at different times after papa was run off. .She said it was some property they were after. Q. Go ahead and tell it. A. She said it was property they were after—John and Abi—and they said they had Mr. Clark going and that they would get their part of the estate and said that Mr. Fisher said so."

The defendant testified in his own behalf and contradicted all of the statements of the prosecutrix implicating him in the crime of incest. He was supported in much of his testimony by the mother of the prosecutrix, and Haggard, the hired man, testified that he was in the room with the prosecutrix at the very time she claimed the act was committed for which the defendant was convicted. And because of his testimony, Haggard, at the request and at the demand of Bissell, the assisting prosecuting attorney, was arrested in the presence of the jury and taken from there and incarcerated in the city jail, and while there Bissell and the county attorney Baum visited him and had a conversation with him and informed him that they had come over to the jail to give him (Haggard) an opportunity to tell the truth, if he wanted to do so. Bissell was placed on the witness-stand by the defendant and questioned by Mr. Jones, and he testified as follows: "Q. I will ask you what conversation you did have with him [Haggard]. A. I went over to the city jail, and I went over with Mr. Jones, Mr. Jefferies and Mr. Baum, and I said: 'Young man, you seem to be up against it, and I have come, we have come over to give you an opportunity to tell the truth if you want to.' Q. Go ahead. What else was said, Mr. Bissell? A. He says: 'By God! You can't bluff me out here; I'm going to stick, and Jones says that you can't do nothing to me.' I think that was the conversation. Q. Did you ask him whether he told the truth on the witness-stand to-day or not? A. I told him I come to give him an opportunity to tell the truth at this time if he wanted to, and he refused to have anything further to do with me, relying upon Mr. Jones to get him out of the trouble that he was in."

It is most remarkable that the prosecuting attorney and his assistant should undertake to have a witness arrested during the progress of a trial in the presence of the jury and then go to the jail and undertake, as is clearly shown by the answers of Bissell, to intimidate him and if possible get him to admit that the testimony he had given on the stand was false. Bissell testified, "I told him I come to give him an opportunity to tell the truth at this time if he wanted to."

This testimony clearly shows the purpose and design of Bissell and the prosecuting attorney to intimidate and brow-beat this witness and compel him to testify as they wanted him to. Bissell says, "to tell the truth," which means to testify as Bissell desired he should. Such conduct is reprehensible in any prosecuting officer and deserved the severest punishment that could be meted out to prosecutors who were thus prostituting their office.

After the court had learned of this conduct on behalf of the prosecuting attorney and Bissell, he called them before him privately and not in the presence of the jury, and told them in very plain English what he thought of their conduct in this matter. Under the constitution and laws of this state every person charged with crime is entitled to a fair and impartial trial, and when prosecuting officers undertake to prejudice a defendant's case, as was done in the case at bar, the plain provisions of the constitution and law are clearly violated and a new trial will be granted.

On the argument on request of counsel for defendant, they were permitted to file with this court the information filed against Haggard after he had been incarcerated in the city jail, as above stated. In that information Baum, as prosecuting attorney, charges the said Haggard with committing perjury in giving his testimony in the case at bar. That information was filed in the district court on the 11th of January, 1915, about nine months after Haggard had been incarcerated in the city jail, and thereafter on the 15th of January, 1915, the cause was dismissed on motion of the prosecuting attorney and the bondsmen of Haggard were released.

The enmity of the prosecutrix toward her father; the claim that she was fearful that he would kill her husband and her testimony that "I have done what I have to do—it was John's life that I done it for," in the face of the fact that she and her husband continued to visit the father every week after their marriage; the fact that the husband was desirous that the defendant purchase his ranch for three or four thousand dollars, and that the county attorney was so insistent when

he ordered the defendant to leave the state that he give the prosecutrix and her sister, Mrs. Dowell, their share of his property—all of this evidence taken together indicates the real motive on which this prosecution was based.

The prosecutrix had charged two other persons in Washington with attempting to or having intercourse with her, and her reputation for truth and veracity, as shown by some witnesses, was bad. That two daughters of mature years, both married, would undertake to send their father to the penitentiary, as these daughters have done, shows their desperate disposition and character. Why would this prosecutrix go home to her father every week after she married and stay two or three days at a time if he were treating her as she testified he was?

However, upon a fair trial of this case, a jury must determine these facts; but the evidence clearly shows that there was so much prejudice and error injected into this record that a new trial must be had.

The giving of an instruction to the effect that the jury might find the defendant guilty on the testimony of the prosecutrix alone, whether or not the same is corroborated, is assigned as error. Said instruction is as follows:

"You are instructed that in a prosecution for incest, if the prosecutrix was the victim of force, fraud or undue influence so that she did not wilfully and voluntarily join in the incestuous act, actuated by the same motives as the defendant, that she cannot be regarded as an accomplice, and that if from her testimony you are satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, then you should find the defendant guilty regardless of whether or not the testimony of said prosecutrix is corroborated."

This instruction was clearly error under the provisions of sec. 7871, Rev. Codes, which section is as follows:

"A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely

shows the commission of the offense, or the circumstances thereof.''

The evidence shows that if the defendant is guilty, the prosecutrix was an accomplice. She was married, about twenty-two years of age when the act complained of is alleged to have occurred. She was living with her husband on a homestead during her married life, and as before stated, went every week to visit her father, the defendant, and she testified that almost on every visit her father was too intimate with her. Regardless of that she kept going there and on the night of January 14, 1914, she alleged this act again occurred. So the record clearly shows there was no force, fraud or undue influence exercised over her, but that she voluntarily committed the act, if the act were in fact committed.

Underhill on Criminal Evidence, sec. 382, states that a conviction will not be had for the crime of incest upon the uncorroborated testimony of the prosecuting witness. And again, at sec. 397, the author says: ''The law regards both parties to the incestuous adultery as accomplices. Hence, the rule requiring the testimony of an accomplice to be corroborated is applicable to the testimony of either testifying against the other.''

Under the facts of this case, it was clearly error for the court to give the above quoted instruction.

The same may be said of the instruction immediately following the above quoted instruction, since there is no evidence showing that force, fraud, threats or undue influence were used on the prosecutrix on the night of the 14th of January, when the illegal act was alleged to have been committed.

Where the testimony of the prosecutrix is contradictory or her reputation for truthfulness and veracity is impeached and the defendant testified and denied specifically the testimony of the prosecutrix and his testimony was corroborated by other witnesses, the testimony of the prosecutrix, standing alone and without corroboration, will not warrant a conviction. (*State v. Trego*, 21 Ida. 625, 138 Pac. 1124; *State v. Tevis*, 234 Mo. 276, 136 S. W. 339.)

The evidence shows that intercourse could not have occurred without the consent of the prosecutrix. She is therefore an accomplice if the crime were committed. (*State v. Mercer*, 17 Tex. App. 465.) According to the prosecutrix's own testimony, this incestuous intercourse continued from the time she was about eleven years of age until she was about twenty-two years of age; that it was repeated once or twice a week during a period of about eleven years, and in the very presence of other members of the family, always in the very room where her own mother or brothers or sisters were sleeping. That this should have continued that period of time without the consent of the prosecutrix is to the ordinary mind unnatural, unreasonable and incredible. We cannot believe it possible that those acts could have occurred as testified to by the prosecutrix without her consent. The irresistible conclusion from all of the evidence is that she was an accomplice in the performance of the act, if it occurred, for which this defendant was convicted. As bearing upon this question, see *State v. Pate* (Tex. Cr.), 93 S. W. 556.

Under the facts of this case the court ought to have instructed the jury that according to the testimony of the prosecutrix she was an accomplice. We think the correct rule is laid down in that regard in the case of *Clifton v. State*, 46 Tex. Cr. 18, 108 Am. St. 983, 79 S. W. 824, a case similar in some respects to the one at bar. The illegal acts alleged there covered a period of some six or eight years and the prosecutrix denied that she engaged in the sexual intercourse with the same purpose and intent as the defendant; that she was neither desirous nor willing to do it; that she did so because she was under defendant's influence and whatever he did she thought would be right, and the court there charged the jury similarly to the charge above quoted, and the court said: "Now, the jury evidently understood from the charge that unless she engaged in the intercourse with the same desire as did the appellant, she would not be an accomplice. This is not the true criterion under the facts of this case. If she submitted to his embraces, as she says at intervals for a considerable period of time and kept silent,

she would nevertheless be an accomplice, although she did not willingly enter into it with the same desire as did appellant.'' And the court held that said charge was error.

So under the facts of this case, the court ought to have instructed the jury that the prosecutrix, according to her own testimony, was an accomplice and that they could not find the defendant guilty upon the uncorroborated testimony of the prosecutrix. In other words, her testimony in regard to the illegal act must be corroborated.

For the foregoing reasons, the judgment must be reversed and a new trial granted, and it is so ordered, and the cause remanded for further proceedings in accordance with the views expressed in this opinion.

After the defendant was convicted and upon application of the defendant, the district judge issued a certificate of probable cause, and ordered that the defendant be admitted to bail in the sum of $10,000 pending the appeal in the supreme court. The defendant was not able to give that amount of bail and is now confined in the state penitentiary. Under the provisions of sec. 6, art. 1, of the constitution of Idaho, excessive bail shall not be required in any case, and it is hereby ordered that the defendant be admitted to bail in the sum of $2,500, the bond to be approved by the judge of the fifth judicial district, conditioned on his appearance for trial at the next term of the district court in Power county, and that he submit himself for sentence and judgment, provided he is found guilty upon a new trial.

Morgan, J., concurs.

Budge, J., did not sit at the hearing and took no part in the decision of this case.