610 P.2d 522

STATE of Idaho, Plaintiff-Respondent,

v.

Thelma GRIFFITHS,
Defendant-Appellant.

No. 12367.

Supreme Court of Idaho.

April 3, 1980.

Rehearing Denied May 30, 1980.

---

2. Idaho adopted the Uniform Building Code on a statewide basis in 1975 in I.C. § 39–4109.

Dean Williams of Kerr, Williams & Clarke, Blackfoot, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, for plaintiff-respondent.

SHEPARD, Justice.

This is an appeal from a conviction of involuntary manslaughter after a jury trial. The charge, verdict and conviction arose out of defendant-appellant Thelma Griffiths' admitted shooting of her husband with a .22 caliber handgun.

In April, 1976, Joe Griffiths arrived home late at night and an argument with appellant ensued. When Joe Griffiths went into a bedroom to change his clothes, the appellant followed and the argument continued during which Joe pushed the appellant. According to the appellant's testimony, she opened an armoire intending to obtain her purse, but instead grabbed the gun which she had placed in the armoire a short period of time before. She testified that her husband Joe lunged toward her with the same expression on his face that she had noted on a previous occasion when he had choked her to near insensibility. The appellant fired the gun five times. Four bullets hit her husband. Two of the shots would have been fatal if no others had been fired. According to her testimony, her husband staggered against her and the two fell into an adjacent bathroom. Appellant admitted the firing of the shots, but contended that she shot her husband because she feared for her life and thus argued a self-defense theory.

Appellant was charged with the crime of second degree murder and a jury trial was held on that charge. The jury was appropriately instructed on included offenses to the charge of second degree murder and an appropriate verdict form was submitted. Appellant was found not guilty of the charge of murder, but was found guilty of the included charge of involuntary manslaughter. Upon conviction she was sentence to a term of three years in prison. Appellant appeals both the conviction and the length of the sentence.

Appellant first assigns error to the trial court's refusal to admit certain psychiatric evidence relating to defendant's state of fear at the time of the shooting. The trial court's rejection of the tendered testimony did not constitute error.

The admissibility of expert testimony is discretionary with the trial court. State v. Crook, 98 Idaho 383, 565 P.2d 576 (1977); State v. Johnson, 96 Idaho 727, 536 P.2d 295 (1975), and absent an abuse of discretion, a decision will not be disturbed on appeal. Stoddard v. Nelson, 99 Idaho 293, 581 P.2d 339 (1978). We find no abuse of discretion.

Here, the witness was permitted to testify on the effects of fear on an individual, but not as to whether, in his opinion, the appellant was in a state of fear at the time of the shooting. The necessity for expert testimony is confined to matters requiring special skill and knowledge not within the scope of understanding of ordinary untrained persons who make up a jury. E. g., State v. Owens, 112 Ariz. 223, 540 P.2d 695 (1975). Here, the witness was asked to testify neither about the mental competency of the appellant nor in the common parlance as to whether she was legally sane or insane. Rather, it is clear from the record that counsel sought to elicit the psychiatrist's opinion that the appellant was motivated by fear at the time she shot her husband. Further, the record is clear from the explanation of the witness that his testimony would have been based on statements of the appellant and the witness' judgment of the truthfulness of the appellant's statements.

Fear is a common human emotion within the understanding of a jury and hence expert psychiatric explanation is not necessary. A jury is as capable as a psychiatrist in determining the ultimate fact in this case—whether appellant acted under fear when she shot her husband. Regardless of the training of a psychiatrist, his expertise does not qualify him to determine whether the defendant killed under fear any more than it qualifies him to testify as to whether the defendant "intended" to kill. The trial court did not err in excluding the testimony.

Appellant next assigns error to the instruction of the court relating to self-defense. Appellant asserts that the instruc-

tion here, which states that homicide is justified and not unlawful when committed by a person in lawful defense of herself, is erroneous and nearly identical to an instruction rejected by this Court in *State v. McGreevey*, 17 Idaho 453, 105 P. 1047 (1909). It is true that the language rejected by *McGreevey* is included as a part of the self-defense instruction in the case at bar. That does not automatically invalidate any instruction utilizing those words, particularly when it is noted that the instruction rejected in *McGreevey* failed to discuss the *appearance* of danger. The instruction here adequately informs the jury of the validity of a self-defense theory when one is confronted with apparent but not actual danger. Instructions must be interpreted in their context and not read as isolated sentences. *State v. Radabaugh*, 93 Idaho 727, 471 P.2d 582 (1970); *State v. Rutten*, 73 Idaho 25, 245 P.2d 778 (1952). Appellant also asserts that the instruction is ambiguous and not as clear or precise as it might be. While the instruction is perhaps not a model, it is not ambiguous, misleading or erroneous.

■ Appellant also asserts error in failing to include five of her requested instructions to the jury. We have examined the requested instructions and find that they were erroneous statements of the law, misleading or adequately covered by the actual instructions given by the court.

■ Appellant next assigns error to the court's instruction relating to involuntary manslaughter. The instruction given is substantially identical with appellant's requested instruction, with the elimination, however, of certain language not applicable to the instant case. Further, we note that defense counsel was interrogated regarding any objection to the instruction defining involuntary manslaughter and defense counsel indicated the lack of any objection to the instruction. Failure to object at the trial level precludes objection at the appellate level. *See State v. Wright*, 97 Idaho 229, 542 P.2d 63 (1975); *State v. Thomas*, 94 Idaho 430, 489 P.2d 1310 (1971).

We turn now to the more substantial portion of this appeal. Appellant asserts that the closing argument of the prosecuting attorney constituted misconduct so prejudicial as to amount to reversible error. Our review of the record discloses misconduct by the prosecuting attorney in his closing argument. The respondent State argues that at most such argument amounted to overzealousness while the appellant asserts that it constitute deliberate misconduct, which severely prejudiced the appellant defendant in the eyes of the jury. The literal language of the prosecuting attorney need not be set forth herein, it is enough to say that his closing argument referred to facts which were not in evidence and urged conclusions on the part of the jury which would have been relevant to a charge of first degree murder. He portrayed the defendant as having deliberately planned and carried out the murder of her husband in a cold and calculated manner, continuing to fire shots into the body of her husband while he was in a helpless position and pleading for mercy.

■ While such statements might constitute prosecutorial license, if based on some peripheral view of the facts in a first degree murder case, the statements were improper in the case at bar were unsustained by the record. While our system of criminal justice is adversary in nature and the prosecutor is expected to be diligent and leave no stone unturned, he is nevertheless expected and required to be fair and has a duty to avoid misrepresentation of the facts and unnecessarily inflammatory tactics. *See State v. Wilbanks*, 95 Idaho 346, 509 P.2d 331 (1973); *State v. Spencer*, 74 Idaho 173, 258 P.2d 1147 (1953); G. Bell, Handbook of Evidence for the Idaho Lawyer 3 (2d ed. 1972).

■ Even if we assume, however, that the misconduct of the prosecutor in the case at bar is egregious, unprofessional and reprehensible, it alone is not sufficient to warrant reversal. *See State v. Smoot*, 99 Idaho 855, 590 P.2d 1001 (1978); *State v. Spencer*, 74 Idaho 173, 258 P.2d 1147 (1953). Likewise, it is not sufficient that the conduct be

contrary to the defendant's interests to require reversal. In the most fundamental sense, almost all portions of the case of the prosecutor must necessarily be contrary to the defendant's interests. Otherwise, the hearing would be bound up in irrelevancy. Rather, we hold that the misconduct must be shown to have materially contributed to the verdict of the jury. *See State v. Smoot, supra; State v. Spencer, supra.*

In *Smoot*, as here, it was alleged that the prosecuting attorney had departed from his proper role and attempted to inflame the jury by his closing argument. This Court, however, found that the weight of the evidence was so great that the prosecutorial comments could not have contributed to the guilty verdict and, therefore, the conviction was affirmed. So in the case at bar, we hold in view of the verdict of guilty of involuntary manslaughter, the closing argument of the prosecutor could not have contributed to that verdict. The prosecutorial argument related to the murder charge. The assertions by the prosecutor that the appellant coldly and deliberately shot her husband clearly were disbelieved and disregarded by the jury. If a verdict of guilty of murder had been returned, our decision, of course, might be otherwise. We hold that the burden of proving beyond a reasonable doubt [assuming that burden is upon the respondent State] that the error did not contribute to the guilty verdict has been sustained.[1]

Appellant contends finally that the sentence of three years imprisonment was an abuse of discretion by the trial

court. The maximum punishment for involuntary manslaughter is imprisonment for a term of ten years and hence the sentence here was well within the statutory limits, well within the discretion of the trial court, and not to be reversed on appeal absent an abuse of discretion. *State v. Cotton,* 100 Idaho 573, 602 P.2d 71 (1979); *State v. Powers,* 100 Idaho 290, 596 P.2d 802 (1979); *State v. Seifert,* 100 Idaho 321, 597 P.2d 44 (1979). Although it is argued that the trial judge *may* have been influenced by certain statements made by police officers, which were contained in the presentence report, allegedly without foundation and prejudicial to the appellant and assuming that those portions of the presentence report were erroneous and improper, we will not presume that the sentence imposed herein resulted from reliance by the trial judge upon the alleged improper statements. We again take this opportunity to note that presentence reports are compiled by non-law trained persons from a variety of sources and contain material necessarily failing to meet standards of evidentiary quality. Nevertheless, we presume that law-trained experienced trial judges will exercise discretion in their utilization of the material contained in such presentence reports. We find no indication of any abuse of discretion and will not indulge in the presumption sought by appellant here.

The conviction and the sentence are affirmed.

DONALDSON, C. J., and BAKES and McFADDEN, JJ., concur.

---

1. In *Smoot*, it was suggested that the standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), was to be applied in determining whether prosecutorial misconduct constituted reversible error. In *Chapman* it was held that before a *federal constitutional error* could be held harmless, the respondent State had the burden of proving beyond a reasonable doubt that the error did not contribute to the guilty plea. Although not necessary to our decision today, more recent cases have limited the "beyond a reasonable doubt" burden of *Chapman* to constitutional errors. *See United States v. Rodriguez,* 573 F.2d 330 (5th Cir. 1978); *United States v. Indian Boy X,* 565 F.2d 585 (9th Cir. 1977), *cert. denied,* 435 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978); *United States v. Valle-Valdez,* 554 F.2d 911 (8th Cir. 1977); *Padgett v. State,* 590 P.2d 432 (Alaska 1979); *People v. Bolton,* 23 Cal.3d 208, 152 Cal.Rptr. 141, 589 P.2d 396 (Cal.1979); *State v. Stilling,* 285 Or. 293, 590 P.2d 1223 (1979); *Campbell v. State,* 589 P.2d 358 (Wyo.1979). As there can be no reasonable doubt that the prosecutorial error did not contribute to the verdict in the present case, we need not decide whether the "beyond a reasonable doubt" standard must be applied in all cases of prosecutorial misconduct.

BISTLINE, Justice, dissenting.

Even before *Chapman v. State of California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), this Court in *State v. Spencer*, 74 Idaho 173, 258 P.2d 1147 (1953), dealt with prosecutorial misconduct in closing summation. Finding such misconduct in that case, the court did not equivocate or mince words, but reversed the judgment of conviction of second degree murder, and remanded for a new trial:

"It is the duty of a prosecuting attorney to see that the accused has a fair and impartial trial. *State v. Bush*, [50 Idaho 166, 295 P. 432] supra; *State v. Irwin*, 9 Idaho 35, 71 P. 608, 60 L.R.A. 716; *State v. Clark*, 27 Idaho 48, 146 P. 1107.

"An associate prosecuting attorney assisting the prosecuting attorney has the same duty and is governed by the same rules of propriety. *State v. Pointer*, 106 Or. 589, 213 P. 621; *Watson v. State*, 7 Okl.Cr. 590, 124 P. 1101.

"While we have generally held that where there is no objection made at the time to the statements by an attorney in his argument to the jury, the court will not consider alleged error in this respect, *Cogswell v. C. C. Anderson Stores Co.*, 68 Idaho 205, 192 P.2d 383, this is not necessarily true as to arguments of prosecuting attorneys in criminal cases. *State v. Givens*, 28 Idaho 253, 152 P. 1054; *State v. Owen*, 73 Idaho 394, 253 P.2d 203. Where the record shows that the prosecuting attorney has been guilty of misconduct calculated to inflame the minds of jurors and arouse prejudice or passion against the accused by statements in his argument of facts not proved by evidence, the conviction will be set aside and a new trial granted."

74 Idaho at 183–184, 258 P.2d at 1153–54.

In *State v. Owen*, 73 Idaho 394, 253 P.2d 203 (1953), the same Court which sat in *State v. Spencer* quoted from *State v. Givens*, 28 Idaho 253, 268, 152 P. 1054, 1058 (1915):

" 'It is the duty of the prosecutor to see that a defendant has a fair trial, * *. The desire for success should never induce him to obtain a verdict by argument based upon anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same.' "

73 Idaho at 408, 252 P.2d at 211.

Shortly after *Chapman*, this Court in *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971), reversed felony convictions, holding that "[t]he trial court should not permit the prosecuting attorney to comment on the defendant's failure to testify at his preliminary hearing." It was held that such "*deprived appellant of a fair trial and was a denial of due process.*" (Emphasis added.) As to defense counsel's failure to object, the Court there recognized that:

"*the obligation of the state to see that defendant receives a fair trial is primary and fundamental.* (Citations . omitted.) In case of fundamental error in a criminal case the Supreme Court may consider the same even though no objection has been made at time of trial." (Emphasis added.)

94 Idaho at 251, 486 P.2d at 262. It cannot be doubted that one issue we decide today is whether the prosecutorial misconduct which was a denial of Thelma Griffiths' federal and state constitutional and fundamental rights to due process can be held harmless beyond a reasonable doubt.

In *Chapman*, the Supreme Court of the United States recognized that its prior cases indicated "that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." The court there, in discussing its "reasonable possibility" holding in *Fahy v. State of Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), said "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless." 375 U.S. at 23–24, 87 S.Ct. at 828. That the prosecutorial conduct which we review in this case is relevant, there can be no argument. The *Chapman* court formulated the rule that "before federal constitutional error can be held harmless, the court must be able to

declare a belief that it was harmless beyond a reasonable doubt." Applying that standard it found the improper comment in *Chapman* was not harmless, saying that only a glance at the prosecutorial comments was required to reach that conclusion, 375 U.S. at 24, 87 S.Ct. at 828, and expressing great dismay for a denial of constitutional rights which denial was "designed and calculated to make petitioner's version of the evidence worthless . . . ." 375 U.S. at 26, 87 S.Ct. at 829.

Admittedly any three members of this Court can retreat from the recent, clear, and sound pronouncements in *State v. Spencer, supra*, and *State v. Haggard*,[1] *supra*, insofar as fair trial due process under the Idaho Constitution is concerned, and without doubt, four members are doing so. However, and as the Court's opinion mentions, there is also upon this Court the obligation to see that due process under the federal constitution has not been violated.

### I.

Although the Court's opinion fairly recites the events surrounding the death of appellant's husband and a synopsis of the prosecuting attorney's "improper," "egregious, unprofessional and reprehensible" summation to the jury, I am unable to agree with the Court's conclusion that "in view of the verdict of guilty of involuntary manslaughter, the closing argument of the prosecutor could not have contributed to that verdict." Neither the case authority relied upon for the foregoing statement nor common logic support the Court's statement. In *State v. Smoot*, 99 Idaho 855, 590 P.2d 1001 (1978), the defendant, convicted of rape, contended that "[i]n his closing argument the prosecutor injected some personal comment and several references to an irrelevant fact of the victim's knowledge of the defendant having a wife who was eight months pregnant at the time of the rape incident." *Id.* at 860, 590 P.2d at 1006. Consonant with the requirements of *Fahy v. State of Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), this Court held

"that there is not a reasonable possibility the prosecutorial misconduct in closing argument may have contributed to the guilty verdict in this case." The prosecutor's remarks in the case at bench, however, unlike those in *Smoot*, were far from irrelevant; on the contrary, the comments were those of an officer of the court presenting to the jury a vivid portrayal of the homicide, based on invented "facts" nowhere supported by the evidence. More damaging misconduct could hardly be imagined. Clearly the issue of guilt in this case was debatable, and clearly the jurors entertained doubt as to the defendant's guilt. What better proof is there of that than that defendant was charged with second degree murder, but acquitted, and also acquitted of voluntary manslaughter?

What is particularly incomprehensible is this rationale given in the Court's opinion:

> "The literal language of the prosecuting attorney need not be set forth herein, *it is enough to say that his closing argument referred to facts which were not in evidence and urged conclusions on the part of the jury which would have been relevant to a charge of first degree murder.* He portrayed the defendant as having deliberately planned and carried out the murder of her husband in a cold and calculated manner, continuing to fire shots into the body of her husband while he was in a helpless position and pleading for mercy."

Whether a defendant is charged with murder, larceny, or running a stop sign, the law as I have known it has never authorized a prosecutor to argue to the jury facts which were not in evidence, and to urge the jury into conclusions which are predicated upon those missing facts. More than that, however, I am completely at a loss to understand the Court's conclusion that such improper and unfair misconduct was cured where the jury's verdict was guilty—but not of second degree murder. The prosecutor's argument, so the Court says, might have been proper had the prosecutor

---

1. In *State v. Haggard* the opinion is silent as to which constitution it makes reference to.

charged defendant with murder in the first degree. Then, says the Court, "if a verdict of guilty had been returned, our decision, of course, *might* be otherwise." (My emphasis.)[2] This is particularly unfathomable. Back of it all, one must assume, must be the strange belief that the jury, having found the evidence insufficient to sustain either a conviction of second degree murder or voluntary manslaughter, then was able to put entirely out of mind the prosecutor's improper statement of facts not in evidence and unjustified conclusions based thereupon, and was able to rationally and dispassionately deliberate upon defendant's guilt of involuntary manslaughter. Those attorneys who have defended even one or two criminal cases will be astonished at the naivete of such reasoning.

In the first place all know of a genuine, real, existing tendency on the part of prosecutors to overcharge, with the idea in mind that the way is thus opened for satisfactory plea bargaining or, where the case goes to trial, to at least allow room for a jury verdict which finds the defendant guilty of the second highest of included offenses— which often may be the offense, a charge for which was that justified by the evidence. Prosecutorial discretion is a term well known to the trial bench, a term upon which many articles have been written. Here prosecutorial discretion was that defendant ought to be charged with first degree murder, and so she was, and so bound over to answer that charge in district court.

There, however, following the filing of an information which charged defendant with first degree murder, and following the filing of the preliminary transcript in district court, the trial court reduced the charge to murder in the second degree.

And on this charge defendant was tried, but not convicted, which has been mentioned, and not convicted of the included offense of voluntary manslaughter. But it must be kept in mind that when this case went to the jury, the instructions of the court authorized verdicts of: guilty of second degree murder, voluntary manslaughter, or involuntary manslaughter; or not guilty. The last comment on the guilt or innocence of defendant which the jury was to hear was the closing by the prosecuting attorney at the tail end of which he said:

> "And I submit that the shots fired in Joe's back were fired at close range and were fired at a time when Joe was on his knees and no longer of any threat to the defendant. I submit further that the evidence indicates that the defendant in this case is guilty beyond a reasonable doubt of second degree murder."

The excerpt above is *not* the sum total of the improper, unwarranted, and prejudicial prosecutorial remarks alluded to in the Court's opinion, but is the final such comment which was made in the prosecutor's closing just before the jury retired. As the Supreme Court of the United States did in *Chapman*, I feel that here, too, this Court should release an opinion which fully discloses the nature and extent of the comments, complaint of which is made, leaving it to the reader or any reviewing court[3] to determine whether this Court is justified in declaring "that the burden of proving beyond a reasonable doubt that the error did not contribute to the guilty verdict has been sustained." Although the opinion of the Court concedes that the improper prosecutorial comments consisted of the assertion of facts not in evidence, the Court then theorizes that the prosecuting attorney

---

**2.** The Court's opinion does not ponder upon the direction it would take had the verdict been guilty of voluntary manslaughter.

**3.** I am not so naive as to believe that defendant's opportunity for further review is great, or even good. No law is made in this case—the only question being whether the Courts has followed the standards mandated in *Chapman*. The Court declares that it has. Nevertheless, I

subscribe to a firm belief that just as trial courts should endeavor to give the parties a record which, when possible, facilitates the taking of an appeal without resort to a reporter's transcript, likewise I believe that an appellate court opinion should even-handedly present the facts and issues determined, enabling a higher court to readily determine if there are questions of law which need to be re-examined.

"urged conclusions on the part of the jury which would have been relevant to a charge of first degree murder." The Court's opinion then, however, inconsistent with its hypothesis, but factually accurate, concedes that the prosecutor portrayed the defendant as "*continuing to fire shots into the body of her husband while he was in a helpless position and pleading for mercy.*" Such portrayal clearly was argument that was intended to, could have, and most probably did influence some members of the jury into or toward the belief that defendant was possessed of the malice which is an essential part of second degree murder, or that she acted with an abandoned or malignant heart, which also may bring about a conviction of second degree murder.[4] Moreover, and probably more damaging to defendant, and wholly unmentioned in the Court's opinion, is the logical result which such improper argument had on defendant's claim of self defense—absolute destruction.[5]

It is impossible for me to say, as do the others on the Court, that "there is not a reasonable possibility the prosecutorial misconduct in closing argument may have con-

tributed to the guilty verdict in this case."[6] For certain I cannot say that I so believe "beyond a reasonable doubt."[7] It is impossible for me to say that the State has demonstrated, beyond a reasonable doubt, that the prosecutor's comments did not contribute to defendant's conviction.[8] *Chapman* dealt not with prosecutorial misconduct, as mere error at trial, but considered "whether there can ever be harmless *constitutional* error" and whether the prosecutor's misconduct in that case was indeed harmless.

## II.

The inflammatory remarks of the prosecutor were damaging enough considered in isolation. However, in this case the necessity for reversal is patent when one observes that the appellant was convicted of a crime, involuntary manslaughter, for which there was no evidence.

## A.

Before discussing the propriety of instructing that involuntary manslaughter in this case was an included offense, first consider the rationale of the Court's opinion

---

4. The trial court's given instructions numbered 17 and 19 defined malice and second degree murder:

    Instruction No. 17:
    "Murder is the unlawful killing of a human being with malice aforethought.
    "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow human being. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."
    Instruction No. 19:
    "In this case, to warrant a verdict of guilty of the crime of Second Degree Murder you must find from the evidence, beyond a reasonable doubt, that:
    "(1) Defendant, THELMA GRIFFITHS, with malice afore thought;
    "(2) In Bingham County, Idaho, on or about April 29, 1976;
    "(3) Knowingly, wilfully, unlawfully, intentionally, and feloniously wounded JOSEPH E. GRIFFITHS, a human being, by shooting him with a 22 caliber pistol;
    "(4) That JOSEPH E. GRIFFITHS died as a direct result of the wounding within one year after such wounding.

"These are the essential elements or material allegations of the crime charged in this case, and the State of Idaho is required to prove each of these elements beyond a reasonable doubt."

5. It must be kept in mind that, as even the Court's opinion concedes, the jury instruction on self-defense was not exactly lucid, greatly compounding the damage done defendant by the comments of the prosecutor. (Further discussion of this point *infra*.)

6. The quoted language is from *State v. Smoot*, 99 Idaho 855, 861, 590 P.2d 1001, 1007 (1978).

7. *Smoot*, at 861, placing reliance on *Chapman v. California*, 386 U.S. 22, 87 S.Ct. 824, 17 L.Ed.2d 708 (1967).

8. In this regard *Smoot* needs to be modified by recognizing that an appellate court's declaration of a belief is not in the abstract, as might be so with religious belief, but that *the State must demonstrate*, on the record, beyond a reasonable doubt that the improper comments did not contribute to the conviction.

relative thereto. It is said that because the appellant did not object to the instruction on involuntary manslaughter—in fact proposed an instruction which included the charge of involuntary manslaughter—that she is precluded from raising the giving of the instruction as an error on appeal.

However, a trial court has a duty to instruct the jury correctly, and this Court may not simply rely upon failure of counsel to propose correct instructions, or failure to object to incorrect instructions, as an excuse for incorrect instructions. The pertinent statute provided: [9]

> 19–2132. "Instruction to jury—Requests—(a) In charging the jury, the court must state to them all matters of law necessary for their information. Either party may present to the court any written charge and request that it be given. If the court thinks it correct and pertinent, it must be given; *if not, it must be refused.*" (Emphasis added.)

In *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973), this Court held that the statute imposed a requirement on the trial court:

> "This provision requires that the trial court give, on its own motion, pertinent instructions by which the jury may be correctly informed with respect to the nature and elements of the crime charged and to the essential legal principles *applicable* to the evidence that has been admitted. *State v. Patterson,* 60 Idaho 67, 88 P.2d 493 (1939); *State v. Freeman,* 85 Idaho 339, 379 P.2d 632 (1963)." (Emphasis in original.)

*Id.* at 275, 506 P.2d at 1348. Obviously a trial court has no duty to instruct the jury on a supposed included offense which in law and reason is not an included offense. Such being not "correct and pertinent" as the language of the statute requires, "it must be refused."

The trial court did not give the instruction requested by defense counsel, pointing out that it was over inclusive. Whether the trial court had in mind to give an instruc-

tion on involuntary manslaughter—on his own motion—is not clear from the transcript of the instructions conference.

Moreover, it is now well established in Idaho that fundamental error committed by the trial court may be cause for reversal even where no objection was made at the time of trial:

> "Counsel for defendant failed to raise an objection to the cross-examination at the time of trial and ordinarily this Court would not consider this assignment of error. However, the obligation of the state to see that defendant receive a fair trial is primary and fundamental. *Pulver v. State,* 93 Idaho 687, 471 P.2d 74 (1970) quoting *McIntosh v. Commonwealth,* Ky., 368 S.W.2d 331 (Ky.Ct.App.1963). In case of fundamental error in a criminal case the Supreme Court may consider the same even though no objection had been made at the time of trial. (citing cases)"

*State v. Haggard,* 94 Idaho 249, 251, 486 P.2d 260, 262 (1971). It can hardly be contended that instructing the jury on a crime for which no evidence has been submitted is other than an error of the most fundamental kind. As stated in *State v. Jones,* 47 Ohio App.2d 8, 351 N.E.2d 798, 804 (1975):

> "If a court erroneously charges on a lesser included offense when not warranted by the evidence the jury may reach a compromise verdict. This is not fair to the defendant. If a defendant is not guilty of the crime charged, his liberty should not be dickered away by a compromised verdict upon another crime which is supported by no evidence. *State v. Loudermill,* [8 Ohio St.2d 79, 206 N.E.2d 198 (1965)]; see also *Bandy v. State* (1921), 102 Ohio St. 384, 131 N.E. 499."

### B.

Manslaughter is of two kinds, voluntary and involuntary. Voluntary manslaughter is an intentional killing, but one done upon a sudden quarrel or heat of passion. I.C.

---

9. The statute was amended in the year following this trial to add another paragraph specifically addressing the trial court's duty of instructing on lesser included offenses. 1977 Idaho Sess. Laws ch. 154, p. 390.

§ 18–4006(1). Involuntary manslaughter is an *unintentional* killing that may be committed in several ways: (1) in the commission of an unlawful act, other than the felonies which would make the killing first degree murder under the felony murder rule; (2) in the commission of a lawful act which might produce death, in an unlawful manner, or without due care and circumspection.

The main distinguishing feature between the two manslaughter offenses is intent, which must be present for voluntary manslaughter, but which is absent for involuntary manslaughter. Cases on this point are legion, and unneedful of citation.

In this *Griffiths* case there is no question but that Thelma intended to shoot her husband. Defendant, who has never denied having such intent, maintains that such intent was born of self-defense on being attacked by her husband and in fear for her life. That the district court's instruction did not include the paragraphs on the reckless, careless, or negligent operation of a firearm or deadly weapon clearly established his view, a correct one, that defendant's actions were not reckless, careless, or negligent.

Further, Idaho case law clearly states that the intent to kill may be presumed from the use of a deadly weapon, at least where the circumstances show it was used in such a fashion as here. *State v. Anstine,* 91 Idaho 169, 418 P.2d 210 (1966); *State v. Buchanan,* 73 Idaho 365, 252 P.2d 524 (1953). Many other statements of this rule can be found; a few are cited. *State v. Brierly,* 109 Ariz. 310, 509 P.2d 203 (1973); *State v. Dixon,* 107 Ariz. 415, 489 P.2d 225 (1971); *State v. Mancini,* 107 Ariz. 71, 481 P.2d 864 (1971); *State v. Prewitt,* 104 Ariz. 326, 452 P.2d 500 (1969); *State v. Foggy,* 101 Ariz. 459, 420 P.2d 934 (1967); *State v. Douglas,* 2 Ariz.App. 178, 407 P.2d 117 (1965); [10] *People v. Parks,* 4 Cal.3d 955, 95 Cal.Rptr. 193, 485 P.2d 257 (Cal.1971); *Shanks v. Commonwealth,* 390 S.W.2d 888 (Ky.1965); *Dearman v. State,* 566 P.2d 407 (Nev.1977); *Moser v. State,* 91 Nev. 809, 544 P.2d 424 (1976); *State v. Woods,* 278 N.C. 210, 179 S.E.2d 358 (1971); *Cullin v. State,* 565 P.2d 445 (Wyo.1977); *Smith v. State,* 564 P.2d 1194 (Wyo.1977); 40 C.J.S. *Homicide* § 79.

Thus it appears that by the prosecutor's position, Thelma's own admission, the court's instruction, and the inference arising from the use of the gun, we have a clear case of an intentional shooting. While the evidence might support a conviction for second degree murder, or for voluntary manslaughter, it will not support a conviction for involuntary manslaughter.

C.

Voluntary manslaughter is a lesser included offense on a charge of murder. But is involuntary manslaughter also a lesser included offense? The texts and the vast majority of jurisdictions answer that it is not.

"Where it clearly appears from the evidence that accused is either guilty of murder or voluntary manslaughter or innocent, involuntary manslaughter or negligent homicide is not involved and an instruction thereon is not necessary or proper . . . ."

41 C.J.S. *Homicide* § 395(2).

"Ordinarily, undisputed evidence of a homicide by intentionally striking or shooting the deceased with a deadly weapon is inconsistent with any theory of involuntary manslaughter, and relieves the trial court of the duty to charge the law as to that offense in a trial for a higher grade or degree of homicide."

40 Am.Jur.2d *Homicide* § 531.

Case law also supports this position.

"Manslaughter is a lesser degree of homicide, not a crime necessarily proved if second-degree murder is proved. Not all of the elements of the two degrees of manslaughter are elements of second-degree murder."

*State v. Dunnan,* 223 Kan. 428, 573 P.2d 1068, 1072 (1978).

---

10. This case states that such intent is inconsistent with involuntary manslaughter.

In *State v. Hickson,* 104 Ariz. 218, 450 P.2d 408 (1969), a defendant convicted of voluntary manslaughter sought reversal because no instruction on involuntary manslaughter was given. The court responded:

"In her own statement the appellant indicates that she pulled the gun out of her purse and fired it. . . . The appellant intended to shoot. This fact makes an instruction on involuntary manslaughter inappropriate."

*Id.* at 410.

*Smith v. State,* 89 N.M. 770, 558 P.2d 39 (1976), involved a murder charge. Defendant was convicted of voluntary manslaughter but the court found no evidence of provocation and stated:

"[I]t cannot seriously be maintained that manslaughter is invariably 'necessarily included' in murder. Different kinds of proof are required to establish the distinct offenses. This is not a situation where the lesser-included-offense instruction was warranted by the evidence; it is error . . . to submit it contrary to the evidence . . . .

.    .    .    .    .

"[A] conviction of voluntary manslaughter where there is no evidence that there was a sudden quarrel or heat of passion must be reversed, and the defendant discharged. Therefore, defendant's conviction of voluntary manslaughter in this case, where there was no evidence of a sudden quarrel or heat of passion, must likewise be reversed and defendant discharged.

"Evidence of a sudden quarrel or heat of passion, . . . is . . . indispensable to a conviction for voluntary manslaughter.    *o*

"It is clear from the record that a verdict of guilty of murder would have been supported by substantial evidence. However, the jury acquitted the defendant of this degree of homicide, and, erroneously instructed, convicted him of a crime which he did not commit. This was an unfortunate mistake, but the remedy does not lie in affirming the unlawful conviction."

*Id.* at 43, 46. Similarly, evidence of negligence is indispensable to a conviction for involuntary manslaughter. Hence it was error to instruct on an offense for which there was no evidence and she should be discharged.

In *State v. Brady,* 105 Ariz. 592, 461 P.2d 488 (1969), the court rejected requests for instructions on both types of manslaughter over a claim of self-defense, finding that there was evidence of malice but none of provocation and no unlawful act other than a felony or lawful act done in an unlawful manner.

Other cases where instructions on involuntary manslaughter were rejected under higher offenses charged due to lack of evidence of negligence or accident include *People v. Gordon,,* 10 Cal.3d 460, 110 Cal.Rptr. 906, 516 P.2d 298 (1973); *State v. Mendell,* 111 Ariz. 51, 523 P.2d 79 (1974); *State v. Duke,* 110 Ariz. 320, 518 P.2d 570 (1974); *State v. Sorensen,* 104 Ariz. 503, 455 P.2d 981 (1969); *State v. Wilson,* 215 Kan. 437, 524 P.2d 224 (1974).

In *State v. Madden,* 104 Ariz. 111, 449 P.2d 39 (1969), a request for an instruction on involuntary manslaughter was denied even though the defendant claimed accidental shooting. Since, according to her, her husband had attempted to grab the gun from her and thus caused it to discharge, the court found no showing of negligence on her part and stated that she was either guilty of murder as charged or innocent.

Most of these cases resulted from *defendants* claiming to be entitled to instructions on lesser offenses, but where the evidence did not support such offenses. However, there seems to be no reason why this should not apply in a defendant's *favor* where he or she maintains that the verdict should have been guilty of the higher offense or innocent.

"The plea of self-defense is consistent with an intent to kill or disable. Indeed, killing in self-defense has been described as an affirmative, intentional act; and some courts even hold that self-defense is limited to cases of intentional killing, or

at least is not ordinarily applicable in the case of a killing resulting from an act which was accidental and unintentional. . . . [A] plea of self-defense is not inconsistent with a killing on provocation in a heat of passion."

40 C.J.S. *Homicide* § 114.

The majority of case law is in agreement. In *State v. Woods,* 278 N.C. 210, 179 S.E.2d 358 (1971), a new trial was granted following a conviction for involuntary manslaughter. The court noted than an instruction on involuntary manslaughter was improper and not to be repeated in the new trial.

"If defendant had reasonable grounds to believe that it was necessary to shoot Terry to save herself from death or great bodily harm, she did not use excessive force in shooting him. Furthermore, when one who is fighting in self-defense uses excessive force he is guilty of *voluntary* manslaughter. . . . There was in this case no evidence which would have justified a verdict of involuntary manslaughter."

*Id.* at 363 (citations omitted). (Emphasis in original.)

California appears to have followed this rationale for years. As early as *People v. Best,* 13 Cal.App.2d 606, 57 P.2d 168 (1936), it was stated that the jury was warranted in concluding that "though the killing was not justifiable under a plea of self-defense, it was done under such circumstances as to reduce the offense to voluntary manslaughter." *Id.* at 170. *People v. Hatchett,* 63 Cal.App.2d 144, 146 P.2d 469 (1944), stated:

"[B]y this definition of involuntary manslaughter the jury were told in so many words that the commission of a lawful act which might produce death, in an unlawful manner, or *without due caution and circumspection,* would amount to manslaughter or, in other words, that the act of shooting, if believed lawful, might constitute the offense of manslaughter if it was done in an unlawful manner or without due caution and circumspection. Any such theory of guilt would have been entirely unsupported by the evidence or any legitimate inferences to be drawn

therefrom. . . . No definition of involuntary manslaughter should have been given at all, but since one was given and defendant requested an instruction for the purpose of curing the error, the latter instruction should have been given. Its refusal suggests that the case was one in which there could be a conviction of involuntary manslaughter, which belief has no support in the record."

*Id.* at 477–78 (emphasis in original).

In New Mexico, "it is quite apparent that when facts are present which give rise to a plea of self-defense, it is not unreasonable that if the plea fails, the accused should be found guilty of voluntary manslaughter." *State v. Lopez,* 79 N.M. 882, 442 P.2d 594, 597 (1968). In fact, "ordinarily evidence requiring a submission to the jury of an accused's plea of self-defense will call for a submission of voluntary manslaughter." *State v. Plummer,* 44 N.M. 614, 107 P.2d 319, 320 (1940), *State v. Simpson,* 39 N.M. 271, 46 P.2d 49 (1935).

*Morgan v. State,* 536 P.2d 952 (Okl.Cr. 1975), followed *Lopez, supra,* and other New Mexico cases in holding that "in every future prosecution for murder, wherein the evidence necessitates an instruction upon self-defense, the trial court shall also instruct upon voluntary or first degree manslaughter . . . as a lesser included offense." *Id.* at 959.

In Arizona a similar rule applies. In *State v. Tuzon,* 118 Ariz. 205, 575 P.2d 1231 (1978), a defendant convicted of second degree murder sought reversal for lack of instruction on involuntary manslaughter arguing that he honestly but unreasonably thought deadly force was needed in self-defense. The court affirmed, noting that such a belief does not *reduce* the crime to a lower degree, and that a plea of self-defense seeks only to *justify* a homicide. *State v. Prewitt,* 104 Ariz. 326, 452 P.2d 500 (1969), in rejecting a request for instructions on involuntary manslaughter, after noting that an unintentional act was contemplated by that offense, said "[t]he evidence shows an intentional act, rather than an unintentional act. As a matter of fact,

one of the defenses of defendant was self-defense." *Id.* at 506. This was repeated in *State v. Young*, 109 Ariz. 221, 508 P.2d 51 (1973), where a similar claim for instructions was rejected because there was no evidence of an unintentional act.

Finally, *Shanks v. Commonwealth*, 390 S.W.2d 888 (Ky.1965), included the following:

"It has long been the law in this state that, if the intention to kill is present, the doctrine of involuntary manslaughter has no place in the case. . . .

". . . Where a deadly weapon was used, and where the accused admits that he was attempting to defend and protect himself with the deadly weapon, there is no room for argument that he did not intend the result of the actions taken by him.

". . . By his own testimony his action was taken, not merely in disregard or indifference of the rights of another, but for the purpose of defending and protecting himself. It is hardly consistent to say that appellant was doing what he could to defend himself but at the same time doing it wantonly or recklessly. His use of a knife, a deadly weapon, while engaged in a fight with the deceased precludes the supposition that such action would fall within the purview of the statute defining involuntary manslaughter."

*Id.* at 890.

The thrust of the law seems to be that Thelma Griffiths was either guilty of at least voluntary manslaughter or she was innocent. However, the jury acquitted her of voluntary manslaughter.

## III.

The Court's opinion raises the thought that there may be some merit, or at least a question raised, by defendant's contention that the trial court erred in the instruction which it gave on defendant's claim that the shooting was done in self-defense.[11] But, reads the court's opinion, when all sentences of the instruction are considered as a whole, there has been no error.

*State v. McGreevey*, 17 Idaho 453, 105 P. 1047 (1909), made it clear that "a person confronted with great danger, has a clear legal right to act upon *appearances* such as would influence the action of a reasonable person. It may turn out that no *actual* danger whatever confronted him and that the whole thing was only an *apparent danger*, but the law of self-defense does not require a man to wait until he ascertains whether the danger is apparent or real." *Id.* at 466–67, 105 P. at 1051. (Emphasis in original.) In *McGreevey* the Court approved an instruction given in that case which stated that "[w]here one without fault is placed under circumstances sufficient to excite the fears of a reasonable person that another designs to commit . .

11. Instruction No. 22:
"Homicide is justifiable and not unlawful when committed by a person in the lawful defense of herself, when she has reasonable ground to apprehend that she is in danger of death or great bodily injury and that there is imminent danger of such a design being accomplished.
"In order to justify the taking of human life in self-defense, the slayer, as a reasonable person, must have reason to believe and must believe that she is in danger of death or of great bodily injury; and, further, the circumstances must be such that an ordinarily reasonable person, under similar circumstances, would believe that it was necessary for her to use, in her defense and to avoid death or great bodily injury to herself, such force or means as might cause the death of her adversary.
"A bare fear of death or great bodily injury is not sufficient to justify a homicide. To justify taking the life of another in self-defense, the circumstances must be such as to excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of such fears alone. The danger must be apparent and must be present and imminent, or must so appear at the time to the slayer as a reasonable woman, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm."

some great bodily injury upon him, and to afford grounds for a reasonable belief, as a reasonable man, that there is imminent danger of the accomplishment of the design, he may, *acting under these fears alone, slay his assailant* and be justified by the appearances." *Id.* at 466, 105 P. at 1051. (Emphasis added.) The Court there said:

> "After he has acted he cannot be judged from the theoretical standpoint of the man who is resting in both apparent and real safety, confronted by no danger and menaced by no threats or demonstrations of sudden violence and felonious import. He must act quickly. He must act as a reasonable and prudent man would be likely to act under similar conditions and circumstances, and this is all the law, reason, or justice demands."

*Id.* at 467, 105 P. at 1051.

Paragraph two of the court's Instruction No. 22, as applied to defendant in this case, advised the jury as to her claim of self-defense that she as a reasonable person was required to have had reason to believe and did believe that she was in danger of death or great bodily injury. This was to say that she had to have reason to believe and did believe that she was in actual danger, as the paragraph is not couched at all in terms of apparent danger, which is not mentioned. Nor is apparent danger mentioned in the preceding and first paragraph of the instruction, which reads only that she must have "reasonable ground to apprehend that she is in danger of death or great bodily injury and that there is imminent danger of such a design being accomplished." Nor do I think that the error of the first two paragraphs is cured by the final paragraph, the first clause of the final sentence of which reads: *"The danger must be apparent* and must be present and imminent . . ." The fault here is that a danger which is present and imminent is, of course, *actual* danger, but the law does not require that the defendant must have acted in fear of actual danger, but rather the defendant may have acted in fear of the appearances of danger. The jury was *not* instructed in the least that self-defense may indeed be

found even where there was no actual danger, so long as the defendant, acting as a reasonable person under the circumstances, believed herself threatened with danger. The word "apparent," unfortunately, has more than one meaning, one of which is: "having such an appearance of reality as to appear *reasonably* true under the circumstances." But it also means "open to view; visible." And it can be understood as meaning "appearing as actual to the eye or mind." Webster's Seventh New Collegiate Dictionary (1972 ed.).

In that sentence of the instruction above quoted, in determining what meaning it would convey to a jury, a key word is "must." As to a danger which the jury is told must be present and imminent, it was also told that "the danger *must* be apparent." Such could only be taken as meaning a real danger. A person may defend himself against actual threatening danger in any event, but the law is that he *"may"* also defend himself from an appearance of threatening danger. In no way can it be said other than that the use of the word "must," especially when taken together with present and imminent, would cause *the jury to consider the self-defense issue in* terms of real danger.

It seems all too likely here that the jury, on reading the first two paragraphs of Instruction No. 22, could not help but be under the impression that their only concern was with actual danger, an appearance of danger being neither mentioned nor contradistinguished from actual danger. The final sentence of the final paragraph in the first clause thereof wraps all together "apparent," "present," and "imminent" danger, and cannot be taken as other than being in reference to actual danger. Any saving grace to the instruction has to be found, if at all, with the (almost parenthetical) phrase following: "or must so appear at the time to the slayer as a reasonable woman." This, in my view, is too little and too late in the instruction, leaving it also open to debate whether this last quoted clause modified the requirement of "present and imminent" or of "apparent," or of all three ad-

jectives. Indeed, it becomes confusing even on our leisurely and close examination where time is not, unlike with a jury of lay people, any problem. Quaere: "The danger must be apparent, or must so appear to the slayer?" That very inquiry suggests that the use of the word "apparent" in that sentence of the instruction can only be taken as meaning a danger which was "open to view, visible," and hence immediate and real.

The final statement of the instruction told the jury that the "killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm." This part of the instruction is not unlike an instruction which would tell the jury that "the right of self-defense does not arise until he (defendant) has done everything in his power to avoid this necessity." Such indeed was a portion of the instruction given in *McGreevey* which the Court there found particularly objectionable:

"This is not the test to be applied, and it is not the rule to be given to a jury as the law of self-defense. A man placed under an apparently threatening and menacing danger is only expected to act as a reasonably prudent person would act under similar circumstances and surroundings. Under such circumstances he ordinarily has but a moment for deliberation and decision. It might so happen that as a matter of fact he could have done any one of a number of other things, and thereby avoided the danger and refrained from committing the homicide. After he has acted he cannot be judged from the theoretical standpoint of the man who is resting in both apparent and real safety, confronted by no danger and menaced by no threats or demonstrations of sudden violence and felonious import. He must act quickly. He must act as a reasonable and prudent man would be likely to act under similar conditions and circumstances, and this is all the law, reason, or justice demands."

17 Idaho at 467, 105 P. at 1051. Whether or not one agrees that the final statement of Instruction No. 22 had the same import as the objectionable portion of the *McGreevey* instruction, nevertheless, it is still prejudicially erroneous against defendant's right to a fair trial in that it continued the theme that the defendant's actions had to be taken in a belief that she acted under a "well-founded" belief that what she did was necessary to save herself from death or great bodily harm—whereas the true statement of the law is that in order to avail herself of the defense she must be found to have acted *in fear*, which fear was *that she was in apparent danger* of death or great injury, it making no difference whether the danger was actual or only apparent, so long as her apprehensions were those of a reasonable person.

For my part I would hold as to Instruction No. 22 that the component parts conflicting one with the other, "and bearing upon the same subject as they do, the jury was left to grope in the dark as to the true rule of law to be applied in such case." 17 Idaho at 468, 105 P. at 1052. At the same time, the instructions which defense counsel requested on the subject,[12] which were re-

12. Defendant's Requested Instruction No. 8:
"YOU ARE INSTRUCTED that the law of self defense requires only that the person must act as a reasonable and prudent person would be likely to act under similar conditions and circumstances."
Defendant's Requested Instruction No. 9:
"YOU ARE INSTRUCTED that one who is assailed or threatened with eminent danger to life to great bodily injury, has the right to defend herself , and if the danger or peril is of such apparent eminence, may use a deadly weapon in her defense."
Defendant's Requested Instruction No. 10:

"The Court instructs the jury as a matter of law that a person need not be in actual, eminent peril of her life or of great bodily harm before she may assault her assailant. It is sufficient if in good faith she has a good and reasonable belief from the facts as they appear to her at the time that she is in such eminent peril."
Defendant's Requested Instruction No. 11:
"YOU ARE INSTRUCTED the right of self defense arises the moment an attack is made, even though the party assailed may not have reason to believe that her assailant intends to inflict upon her great bodily injury the moment he makes the attack, or it becomes re-

fused as covered, were nevertheless good statements of the law, and would have, if given, perhaps enabled the Court to say, as it does, that the instructions taken as a whole embodied all of the law on the subject of self-defense.

Even in the absence of the improper prosecutorial comments, the giving of Instruction No. 22, and the failure to give defendant's requested instructions 8 through 12, require that a new trial should be had. With the prosecutor's comments, moreover, the claim of self-defense was totally emasculated.

IV.

The defendant also assigns error in the ruling which excluded the testimony of Dr. Ackley. In rejecting the offer of proof, the trial court explained:

"I say this is not competent evidence because . . . [psychiatry] is more an art than a science; it is not adapted to the standpoint that it's a science with which a jury needs help . . . if we got the proper kind of a jury and if they watch closely enough, they might be able to arrive at the same thing that he arrived at."

Although the jury *might* not need the help it would receive from such testimony, and even though the jury might reject it, the real issue is whether the defendant here was entitled to have such testimony submitted for the jury's consideration.

*Bean v. Diamond Alkali Co.*, 93 Idaho 32, 454 P.2d 69 (1969), states:

"An expert is generally defined as someone possessing a certain skill or knowledge which is beyond the competence of the average layman or juror . . . as

" ' * * * one who has superior knowledge of a subject, and is therefore able to afford the tribunal having the matter under consideration a special assistance . . . .' "

*Id.* at 34–35, 454 P.2d at 71–72 (citing *Greenstreet v. Greenstreet*, 65 Idaho 36, 139 P.2d 239 (1943); *Sturgis v. Garrett*, 85 Idaho 364, 379 P.2d 658 (1963)). The question, then, is whether psychiatry is a "skill or knowledge beyond the competence of the average layman," making psychiatric testimony admissible in a criminal action wherein an issue is drawn as to a defendant's mental condition at the time of a homicide—a question of first impression in this jurisdiction. The legislature, so it seems, has declared to the judiciary that it is.

Idaho Code § 18–211 provides for the court to appoint a psychiatrist to "examine and report upon the mental condition of the defendant." In *State v. Gerdau*, 96 Idaho 516, 531 P.2d 1161 (1975), the defendant presented psychiatric testimony of three doctors on the issue of Gerdau's sanity. When one was claimed to have changed his testimony from that earlier given, the State was allowed to bring in the testimony of a court-appointed psychiatrist. Idaho Code § 18–213(2) provides for examination by a defendant's own psychiatrist; § 18–213(3) allows either party or the court to call the court-appointed psychiatrist as a witness; and § 18–213(4) states specifically that when a psychiatrist who has examined the defendant testifies, he may state "his diagnosis of the mental condition of the defendant at the time of the commission of the offense charged." Responding to the legislative enactment, psychiatric testimony has been received without question. However, *State v. Myers*, 94 Idaho 570, 494 P.2d 574

reasonably apparent that he intends to execute such purpose, and has the present ability so to do, the right of defense arises." Defendant's Requested Instruction No. 12:
"YOU ARE INSTRUCTED that it is lawful for a person who is being assaulted, and who has reasonable ground for believing that bodily injury is about to be inflicted upon her, to stand her ground and to defend herself from such attack, and in doing so she may use all force and means which she believes to be

reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances to be necessary to prevent the injury which appears to be eminent.
"The law does not require anyone to submit meekly to indignities or violence to her person, she may lawfully repel her assailant with as much resistance and of such character as is necessary and at the time available to her."

(1972), held that it was not *binding* on a jury.

Nor do I reject the holding of *State v. Neil*, 58 Idaho 359, 74 P.2d 586 (1937), that where the jury is as able to draw inferences from the evidence as an expert, because the matter is one of common observation and experience, the court may reject the testimony. The trial court apparently believed this to be the case here. Dr. Ackley did admit that the jury could itself decide whether Griffiths told the truth when she stated that she acted in fear. However, this is not a sufficient basis for the trial court's ruling, especially where the doctor also testified that he had access to data that the jury did not have and hence was *more able* to ascertain the truth than the jury. Nor does the fact that Dr. Ackley was, in effect, stating that Griffiths was telling the truth as to her fear prevent admission of his testimony as hearsay, for he did not merely repeat her assertions but made his own independent diagnosis based on many factors. She was entitled to the benefit his testimony might confer on her version of the shooting.

It is also not objectionable that Dr. Ackley would have testified relative to an issue that the jury was to find, *i. e.*, fear. "The fact that the answer was the witness's opinion on one of the ultimate issues for resolution by the jury does not make the admission of such evidence error of a wholly prejudicial nature." *Davis v. Nelson-Deppe, Inc.*, 91 Idaho 463, 469, 424 P.2d 733, 739 (1967). As was said in *Bean*:

"A person possessing skill or knowledge qualifying him as an expert is generally allowed to express his opinion as to matters in issue when an opinion would be of appreciable help to the jury in finding the facts."

93 Idaho at 35, 454 P.2d at 72. The jury should have been given the doctor's testimony. It would, of course, be free to determine the amount of weight which such testimony should be accorded. *Myers, supra; Gerdau, supra.*

I find the *Gerdau* case most persuasive. There it was the State contending for the admissibility of such testimony. After testifying on the insanity issue and stating that no impairment from mental disease or defect existed, the State's psychiatric expert further testified as to defendant's state of mind at the time of the incident in question:

[Prosecutor] "Do you have an opinion as to whether or not the defendant has any corrupt motive or was seeking any revenge, that is having this state of mind during the period of time from the time he was ejected from the premises to the time that the shots were actually fired?

"A Yes, I believe I have an opinion.

.     .     .     .     .

"My opinion is that, speaking as a direct statement to me, feelings of anger about what happened, that this was the motivation, therefore the behavioral .    . this was the feeling that he was experiencing and out of this his action arose, out of his extreme anger. If the matter of revenge is something of before the events, this I don't know, he denied any previous difficulty.

"I think his behavior, however, was a direct response to his feeling of anger and there was a direct cause and effect relationship."

The doctor's testimony there established the employment of techniques nearly identical to those used by Dr. Ackley here. The doctor interviewed Gerdau and obtained his history, social, medical, and educational, and his work experience. He asked for Gerdau's self-evaluation and his description of the shooting there involved, including his feelings both during and after the event. He tried to gain insights into Gerdau's emotional adjustment and evaluated his attitude toward the doctor, taking the stress of the situation into account. The doctor noted his posture, his alertness, and his voice inflection, and gave simple tests of Gerdau's mental functioning.

The procedures used by the doctor in *Gerdau* are in no way distinguishable from those used by Dr. Ackley on Thelma Grif-

fiths.[13] The doctor testified in *Gerdau,* as here, that "these tests are not definitive." And whereas the doctor in *Gerdau* interviewed Gerdau only one time, during which Gerdau was undergoing all the stress associated with his trial, here Dr. Ackley had interviewed Thelma Griffiths four times for a total of over three hours (and interviewed her children for an hour as well). Considering that the district judge in *Gerdau* admitted the testimony in spite of all the infirmities inherent in it, and this Court upheld its admission, I am unable to be persuaded that Dr. Ackley's testimony should not have been admitted. Whether counsel made the district court aware of the decision in *Gerdau* does not appear.

Other jurisdictions have allowed such testimony. A leading case is *People v. Wells,* 33 Cal.2d 330, 202 P.2d 53 (1949), in which it was said concerning psychiatric testimony that:

"[T]he jury could well be materially aided by the knowledge that, in the opinion of

qualified experts, the defendant's condition was such that he might readily have acted from genuine fear rather than from a desire for vengeance or from any other malicious purpose. . . .

. . . . .

"[I]t is fundamental that at the trial upon a not guilty plea evidence, competent in character, which tends to show that a defendant, at the time he committed the overt act, either possessed or did not possess the specific essential mental state . . . is admissible."

202 P.2d at 63. In *Fox v. State,* 73 Nev. 241, 316 P.2d 924 (1957), it was said of a defendant's state of mind that "[u]pon this issue all material evidence may be considered," citing *Wells. Battalino v. People,* 118 Colo. 587, 199 P.2d 897 (1948), held that:

"[E]vidence of insanity, or rather, *evidence of the condition of the mind* of the accused at the time of the crime, together with the surrounding circumstances, may

13. A small portion of Dr. Ackley's lengthy testimony serves to show both the similarity of technique and the substance of the testimony:

[Counsel]: ". . . Did Thelma give you some history, some of her history and background in the course of those tests?

"A. Yes.

"Q. And did you use that history as part of your analysis and diagnosis?

"A. As part of it, yes.

"Q. And what else did you use?

"A. My observations of her patterns of emotional response, her ways of responding as she gave me that history.

. . . . .

"Q. Were you able, then, in the course of this interview, to obtain a subjective insight into the patient to determine whether or not she did have a state of mind motivated by fear . . . ?

"A. Yes. That was the impression that I formed.

"Q. And did you use these—this subjective insight that you were observing—the physical features that you were observing, the intonations, the tone of pitch and the nervousness . . . ? Did you you use these subjective tools in analyzing, diagnosing the patient?

"A. Yes. That's right. The same account given without the neuromuscular responses wouldn't impress me the same way. . . .

"Q. Then these tests, these subjective tests, these physical features that you observed, are reliable medically and you can

formulate an opinion based on a reasonable medical certainty that the patient did act under a certain state of mind?

"A. Yes, I can. May I say that, in doing psychotherapy, you're constantly reading that pattern of response: not only what the patient says, but the pattern of emotional response that you sense in them while they're saying it. And, if you can't detect that, there's no way in doing therapy that you can direct your interpretations to things below the level of immediate consciousness of the patient. It's a skill that a psychiatrist has to have. You practice it all the time.

. . . . .

"Q. What is your medical opinion and diagnosis as to her state of mind on that date?

"A. It was my impression that she was motivated by fear at the time that she shot him.

"Q. Do you have an opinion whether or not the act . . . was or was not the result of malice aforethought?

"A. I don't believe she was acting from malice. I believe she was acting in a self-protective way and in panic, in fear.

. . . . .

"Q. . . . [T]he defendant was acting under fear of her life or great bodily injury and therefore her reaction was in self-defense?

"A. Yes."

be introduced, not for the purpose of establishing insanity, but to prove that the situation was such that a specific intent was not entertained—that is, *to show absence of any deliberate or premeditated design*."

199 P.2d at 901 (emphasis in original). And in *State v. Griffin*, 99 Ariz. 43, 406 P.2d 397 (1965), a case involving a claim of self-defense as well as insanity, the court held that:

"The court should have allowed great latitude to the defendant in offering proof of his mental state during the actual incident involving the shooting, and during the time when the altercations commenced."

406 P.2d at 402.

The State argues that the testimony was properly excluded because Dr. Ackley, in using the terms "malice aforethought" and "self-defense," did not ascribe thereto the accepted legal definition thereof. In *People v. Gorshen*, 51 Cal.2d 716, 336 P.2d 492 (1959), a doctor "gave his opinion of the 'medical essence' of malice aforethought." The court found no error in allowing the testimony:

"The trial court correctly overruled the People's objection that by this testimony the doctor gave 'a medical interpretation of a legal principle.' The court did not permit the doctor to usurp the judicial function of interpreting legislative language; rather, it properly permitted him to explain what he meant by his opinion that defendant lacked malice aforethought."

336 P.2d at 496 n.3. Here, Dr. Ackley would have testified that Griffiths acted in fear, not in anger or revenge, and without malice, which he defined as "hostility, anger, or some colder, more chronic mode of hostility rather than . . . fear." Although this is not the legal definition, his explanation was sufficient. Counsel or the

court could have brought out before the jury that the doctor's definition was not to be taken as legal authority. The court's instruction as to the correct legal meaning of malice would have adequately advised the jury. Similarly, if the doctor considered self-defense as meaning fear of *future* attacks rather than an ongoing or imminent one, as the State argues he may have, cross-examination and proper instructions would have cured any problem.

As a final note it should be pointed out that the State, though free to challenge the qualifications of Dr. Ackley, instead offered to stipulate to them. The trial court's ruling, as noted, was based on what he felt was insufficient scientific foundation. I would hold that the testimony should have been allowed in the absence of any lack of qualifications.[14] The prosecution, of course, would have had the right of cross-examination.

V.

A final item which I believe requires comment beyond that found in the Court's opinion is the presentence investigation report filed with the court. Attached were letters from two police officers and the deputy prosecuting attorney. A cursory glance shows that these letters were highly prejudicial and constituted an attempt to in effect re-try the case by influencing the sentence.

The first letter was from Reed Hayes, Chief of Police in Shelley. He inserted several comments not supported by the evidence, such as "[w]e found it strange that Joe did not notice the gun missing until the morning of his death," and "[w]e found a empty .22 cal. shell casing on the back steps . . . perhaps when the gun was retrieved from the basement it was fired out-back to see if it works . . . ." Hayes went on to say that:

---

14. The trial judge also apparently justified his decision in part by noting that a polygraph is also indicative of whether a defendant is telling the truth, yet is not generally allowed into evidence. There appears to be a developing trend toward allowing polygraphs, although admit-

tedly only under certain conditions. *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962); *Commonwealth v. Vitello*, 376 Mass. 426, 381 N.E.2d 582 (1978); *Commonwealth v. A. Juvenile*, 365 Mass. 421, 313 N.E.2d 120 (1974); *Corbett v. State*, 584 P.2d 704 (Nev.1978).

"We could find no reason for anyone to shoot him. . . .. Why didn't she leave the house, she had plenty of opportunity to do so . . . [she] followed him [into the bedroom]. She claimed that he had been hitting her. Was she asking for more? . . . When the gun was pointed at Joe he had no other way out of the room but through Thelma. . . .

"We all hope that we aren't called out to investigate another homicide at the Griffith's residence."

The next letter was from Officer Tony Young. The first and last paragraphs suffice to show his attitude:

"Throughout the entire investigation of the death of Joe GRIFFITHS, I came to the conclusion that a great injustice had occurred. From the moment that I was contacted on the night of the shooting, to the last day of trial I felt that Mrs. GRIFFITHS was guilty of first degree murder. These conclusions were not drawn by the fact that I was an investigating officer, nor that I was merely a prosecution witness. This conclusion was brought forth by the facts that I had witnessed throughout the investigation itself.

. . . . .

"I believe that Mrs. GRIFFITHS is guilty of first degree murder and that she should have been found guilty of that charge. I believe that her actions on the night of the shooting were premeditated and occurred with malice aforethought. I believe that Mrs. GRIFFITHS placed the gun in the storage cabinet in the bedroom for the purpose of using the firearm later in the evening when Joe arrived home. As she apparently did. Furthermore, I believe that Mrs. GRIF-

FITHS is a dangerous person, and that she should be strictly dealt with when her sentence is passed. I might also add that I don't believe that I would be surprised if I were called to that same house tonight to investigate another shooting."

The final letter was from the prosecutor himself:

"The most striking feature of this case is the Defendant's inability to face the reality and significance of her crime. . . I doubt Thelma Griffiths will ever show . . . the slightest remorse or regret for the killing of her husband. During the trial, the Defendant attempted to blame the entire incident on her dead husband. She presented a well rehearsed version of the facts which contradicted her earlier statement to police officers. We believe this feeble attempt to rationalize her way out of blame in this case indicates a dangerous view of herself in relationship to others. Thelma Griffiths has not appreciated that her acts caused the death of a human being. If she were allowed a probation, I feel that this would re-enforce her rationalization of her acts to a point that she may not be deterred from committing further acts of violence."

Since the judge correctly granted a motion to strike these letters and imposed only a three year sentence as against the eight years recommended by the prosecutor, it cannot be said that he abused his discretion or was swayed in his decision by these letters. However, I do feel constrained to comment on the impropriety of such letters being attached to the presentence report.

Police, like prosecutors,[15] have a duty to the public. Just as reversals may be given for prosecutorial misconduct, so may they

---

15. An Idaho prosecutor, like a judge, is a judicial officer. *See* Idaho Const. Art. 5, § 18. As *State v. Wharfield*, 41 Idaho 14, 17, 236 P. 862, 862–63 (1925), explains:

"It is plain that the intention of the framers of the Constitution, and of the people in adopting it, was to do away with the office of district attorney for each county, and that, by placing the creation, election, qualifications, tenure of office, and duties of the office of district attorney in that part of the Constitu-

tion devoted to the judicial department, they charged him with the performance of duties and the exercise of powers properly belonging to the judicial department. While not making of him a judicial officer in the sense of being a judge, yet he was, if not a *quasi* judicial officer or an officer of the court, at least an officer of the judicial department, charged with the exercise of powers properly belonging thereto."

be given for police misconduct in seizing evidence, eliciting confessions, or brutalizing suspects. While there may be no technical violation of Thelma Griffiths' rights here, it is indeed a sad day when a defendant is virtually attacked and pursued so viciously by the very officers entrusted with the public safety, to the extent that they would attempt to influence the court to disregard a jury verdict—long considered as one of our greatest protections—and continue to seek that punishment which *they* feel is warranted.

Here, too, even though the letter of the prosecutor was stricken, it must be considered in our assessment of the prosecutor's final summation, and clearly forces the conclusion that the improper remarks in that summation were not the result of misdirected prosecutorial zeal, but delivered with the design and calculation mentioned in *Chapman v. State of California, supra* at 829.

> "It is clearly the duty of the prosecutor and his assistants to see that the accused has a fair and impartial trial. Counsel for the people in a criminal case must constantly keep in mind that the people he represents are only concerned with the truth and the facts established by competent admissible evidence."

So spoke Justice Knudson for a unanimous Court in *State v. Storms*, 84 Idaho 372, 378, 372 P.2d 748, 757 (1962).

Police play an important part in the prosecution of criminals, and properly so. But they may not act as jury and judge; their function lies in collecting facts and presenting them to proper authorities, not in deciding the offense committed and the appropriate penalty. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). For the officers to have written such letters was presumptuous at best; at worst, terrifying. The police conduct here was inexcusable and, even absent any other error, the prosecutorial misconduct, already discussed, could have alone required a new trial.

The judgment of conviction should be reversed.

## APPENDIX TO DISSENT

Excerpts of the prosecutor's remarks and comments.

Then you heard several of the stories by the defendant about Joe and her relationship together and how at times she stated in her story that Joe got violent.

I wish Joe were here to tell us his side of the story. I don't portray Joe as being a perfect individual, but I question if he was as bad as the picture that has been painted of him.

\*    \*    \*    \*    \*    \*

Ask yourselves this question: If Joe was that bad, if he did all of those things, why didn't the defendant divorce him? Why didn't she leave him? If she was truly afraid for her life, why didn't she go to Idaho Falls, and visit with her family there? And her father said, "I love my daughter. The home is always open to her."

\*    \*    \*    \*    \*    \*

There's evidence to show that Joe was worried about his wife and he wanted to know where she was at, and when she would come home, if she was late, how come she didn't come home on time. Perhaps you can infer from this that Joe— there was a little mistrust in the marriage.

Joe may have worried about the defendant, but there's no evidence to show that the defendant worried about Joe. She wanted to know where Joe was at and what he was doing and how come he wasn't home on time. You recall a woman by the name of Shirley Chesnovar. She sat here on the witness stand, and you had an ample opportunity to appraise her demeanor and attitude and tell whether or not she was telling the truth. And she said, "Yes, the defendant was worried." And she went over and talked to Shirley Chesnovar, and Shirley Chesnovar said, "I don't have any romantic intentions towards your husband. I don't want to get involved with him. I'm happily married."

Evidently this didn't satisfy the defendant—

MR. WILLIAMS: Your Honor, I'm going to object to that statement. I think that the prosecutor must remain within the realms of evidence in arguing to the jury, and that the statement of his own witness was that it seemed to satisfy the defendant and she felt better after that.

THE COURT: Mr. Williams, the Court has instructed this jury that the arguments of counsel are not evidence and a proper matter to be considered by the jury only if counsel keep within the evidence and the law. And the jury has heard that instruction and will be guided accordingly.

You may continue, sir.

MR. SORENSEN: Thank you.

*　　*　　*　　*　　*　　*

Also it was pointed out, she stated later on, that another reason she took this was that Joe was going to shoot the neighbor's dog who was following around a 14-year old female dog owned by the Griffiths that happened to be in heat. You can infer other things from that, too. You can infer other meanings and reasons why she took that pistol and why she put it downstairs.

*　　*　　*　　*　　*　　*

The argument ensued in the front room in this part of the house right here (indicating on diagram marked State's Exhibit 1). What happened then? The argument ceased. Joe decided to go bowling. He went into the bedroom, and he was there for about five minutes, undressing, his personal items here on the bed (indicating). I suppose he got his bowling shirt out, his pants. I don't know where he kept them. Had his shorts on, T-shirt, sox.

While he was there undressing, where was the defendant? She was here in the front room (indicating), thinking. She waited five minutes. She was thinking and contemplating her next actions. She stated she came in to go bowling with him. The argument again ensued. But it wasn't a normal argument this time. The argument centered around Joe and Shirley again. But this resulted in something far more serious than Joe leaving the room to go bowling.

At this point in time, the defendant opened the armoire and reached in and grabbed State's Exhibit 3, a .22 semiautomatic pistol. And she prepared it to fire. She took the gun and she intentionally pointed it and she pulled the trigger. And she pulled the trigger again and again and again and again. The gun could no longer fire. It was empty. There were no more shells available. After this was over, Joe was lying in the bathroom mortally wounded and dead.

What was the sequence of the shots? You decide. There were five shots fired. (Mr. Sorensen commencing to indicate on State's Exhibit 45, the maniken) One shot hit Joe in the front right about there (indicating). One shot hit the dresser, the vase, against this wall, and pieces of it were found here in front of the dresser (indicating). Three shots hit Joe in the back. Shot No. 3 was almost point blank, fired almost up against his body. No. 4 was fired from four—from two to four inches away. And No. 5 was fired about four to six inches away. The first shot was fired at a distance greater than six inches.

I invite you now, in your deliberations, to look over the real evidence that we've presented. Look over the pictures, look over the wounds. Compare them with the test firing results of James Mason. Compare them, and come up with the story of how this event took place. And I propose now to tell you a story, based on this evidence, of the sequence of the shots, and I'll tell you the reasons why I come up with this sequence.

I believe Joe was standing here, down by the bed. And the gun was pulled. The first shot rang out and he said, "Oh God, I've been hit." And he raised his hands (indicating). And what is he going to do? Where is he going to go in the bedroom? There's no place to go. The person shooting him is standing in front of him between he and the door. He's got to go towards her or the door. He's got to get out. He can't do anything. Is he going to stand there and be shot?

He moves toward her. He's shot. He's wounded. His hands touch her body. He is down. A shot is fired up high, almost point blank range, touching his back, down (indicating).

Somewhere, perhaps just before that, a shot was missed. Maybe he got to her and moved the gun, she missed him; or maybe she just fired—when he started coming towards her, she fired wild; I don't know exactly where this shot was missed. But when Joe was shot here and here (indicating), he was on his knees. His hands came down her body and he was on his knees, he was no longer a threat, he was out of commission, and probably if given proper medical attention, he would have lived—

MR. WILLIAMS: Your Honor, I object to that statement. That's not in evidence—

THE COURT: Well, it doesn't purport to be evidence. And the jury has been appropriately instructed, sir.

MR. WILLIAMS: All right.

MR. SORENSEN: Joe is on his knees, maybe stumbling some more, maybe trying to move into the hallway.

If you recall, the ballistics expert said when she fired that shot, I think he stood right about here and he said it would bounce over here to the right about six feet (indicating). She could have fired the gun from inside the door and the bullet could have bounced out through that door and glanced against the wall here. But you recall, Vicki's bedroom door was closed, so they could have landed here (indicating). All the shots could have been fired right in the bedroom. It's a possibility, I don't know. There's only two people that know: the defendant and Joe Griffiths. I submit that Joe was on his knees, and, very cold and calculated, the defendant pulled trigger once; Joe moved again, she fired again; backed up; Joe kept crawling on his knees, and ended up there (indicating).

We've had ample testimony to show that Joe was a pretty big guy. He was about five eight, five nine, 180 to 190 pounds. And I submit if there had been a struggle for the gun in the bedroom, would he have been shot in the back? Would he have been able to grab the woman, the defendant, around the arms, would all the shots have been here at close range (indicating)? Yes. They would have been.

Could she have reached around and fired into his back towards her, on this side, and then on this side (indicating), and have the shots crisscross and end up implanted in the sternum?

Is that a reasonable explanation? You decide.

There's some wounds on Joe. There are some wounds on his shins, his knees, his elbow and his forehead. I believe you can suggest that, here's this big guy that purportedly had physical relationship with the defendant where he actually hurt her, and yet he's the one with all the wounds. He's the one that's got all the marks on his body and the four bullets.

I don't think it occurred like that. Joe was hit and wounded and unable to inflict grievous bodily injury to the defendant after the first shot. He couldn't get to her before she fired that gun to stop her. He was shot before he got there. Again, Joe and the defendant know.

\*  \*  \*  \*  \*  \*

You look that transcript over and you listen to the tape, if you want, and decide what was predominant on her mind at the time she pulled the trigger, what bothered her to fire those five shots, four of which shot and killed Joe Griffiths.

Well, I—I think you can infer. What I said was merely argumentative and it's not evidence. You can decide for yourselves. Maybe you'll decide the first shot was the killing shot, and then right in the back, and that Joe was reaching into the closet when the shot was fired and that's why he couldn't—wasn't able to injure the defendant. Maybe you'll decide that. I don't know. But, whatever it was, there was four shots in Joe's body, three of them in the back. Try to account for that. Our office has tried.

\*  \*  \*  \*  \*  \*

Finally it says that malice can be expressed when there's a deliberate intention unlawfully to take away the life of a human being. Again, what was the dominant thing on her mind? What did she do? She reached in and got the gun, pointed it and fired it until it was empty. I submit that Joe was on his knees the last two shots.

\* \* \* \* \* \*

You've heard the evidence. I'm not going to go over it again. You know our position on this point. We feel that she did with malice aforethought kill Joe Griffiths.

\* \* \* \* \* \*

I submit that the reason for shooting in this case was jealousy. She was plain jealous of Joe bragging about his conquest. I'm not saying Joe did this. I don't know if he did in fact have a girl friend. But he brought it up. Now is that considerable provocation in and of itself? I submit, no, it wasn't. She'd known about it for a year. They'd talked about it. They'd had arguments about it. She never before shot him.

This was different. She had an opportunity to take five minutes of her time to think over and ponder what she was going to do and go in the only room in the house where she knew where the gun was and then use it.

\* \* \* \* \* \*

And I submit that the shots fired in Joe's back were fired at close range and were fired at a time when Joe was on his knees and no longer of any threat to the defendant. I submit further that the evidence indicates that the defendant in this case is guilty beyond a reasonable doubt of second degree murder.